

Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
Louis N. Boyarsky (#263379)
**GLANCY BINKOW & GOLDBERG LLP**
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Counsel for Plaintiff*
[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

SACV14-00110-DOC(JPRx)

| | |
|---|---|
| TIMOTHY J. FOSS, Derivatively on Behalf of Himself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> CRAIG A. BARBAROSH, GEORGE H. BRISTOL, JAMES C. MALONE, PETER M. NEUPERT, MORRIS PANNER, D. RUSSELL PFLUEGER, STEVEN T. PLOCHOCKI, SHELDON RAZIN, and LANCE E. ROSENWEIG <br><br> Defendants, <br><br> -and- <br><br> QUALITY SYSTEMS INC., <br><br> Nominal Defendant. | Case No. <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiff Timothy J. Foss ("Plaintiff"), by and through his undersigned attorneys, brings this action derivatively on behalf of nominal defendant Quality Systems, Inc. ("Quality Systems" or the "Company") and alleges upon personal knowledge as to himself and his own acts, and as to all other matters based upon the investigation conducted by their attorneys which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, documents, analyst reports, news reports, press releases, and other publicly available information regarding the Company, as follows:

## INTRODUCTION

1.     This is a shareholder derivative action brought on behalf of the Company against the members of its Board of Directors ( the "Board")[1] and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and other violations of the law that occurred from at least May 26, 2011 through the present (the "Relevant Period").

2.     According to its public filings, nominal party Quality Systems manufactures information systems and practice management software for medical and dental practices.  Quality Systems trades on the NASDAQ Stock Exchange ("Nasdaq") under the symbol "QSII".  Throughout the Relevant Period, the Individual Defendants (as defined herein) caused or allowed the Company, in its public filings, press releases and communications with analysts, to tout factually baseless projections of revenue and earnings growth.  For example, in a July 13, 2012 proxy statement filed with the SEC, the Company boasted that "for fiscal 2013, we expect that revenues will increase in the 20%-24% range and we expect

---

[1] At the time of filing this action, Defendants Craig A. Barbarosh, George H. Bristol, James C. Malone, Peter M. Neupert, Morris Panner, D. Russell Pflueger, Steven T. Plochocki, Sheldon Razin, and Lance E. Rosenweig comprised the Board or the Individual Defendants.

earnings per share to grow by 20%-25%." The Company made these statements despite receiving comment letters from the SEC on July 3 and July 9, 2012 requesting that the Company provide support for its projections. The Individual Defendants ignored the SEC and on July 13 and July 23, 2012, Quality Systems reaffirmed the false guidance that was provided to the market in its Definitive Proxy Materials (the "Proxy Materials"). Notably, the Proxy Materials were signed by Defendant Razin.

3.     There was no reasonable basis for the Individual Defendants' positive statements touting the Company's purported growth prospects. In reality, the Individual Defendants had engaged in or consciously permitted a widespread and long-lasting scheme by which they caused or allowed the manipulation of Company guidance.

4.     On July 26, 2012, the Company announced that the guidance provided in the Proxy Materials was being retracted due to the fact that earnings per share at the Company had plummeted. The news shocked the market. Quality Systems stock fell nearly 33% and analysts immediately downgraded Quality Systems stock causing the Company to suffer substantial injury by losing nearly $330 million in market capitalization. As a result, the Company now faces a securities fraud class action pending before this Court, entitled *Deerfield Beach Police Pension Fund v. Quality Systems, Inc., et al.*, Civil Action No. 13-01818.

5.     The Individual Defendants were fully aware of the problems related to the reporting of the Company's guidance yet they breached their fiduciary duties by failing to take appropriate action. In fact, knowing the impact of the truth emerging, Defendant Steven T. Plochocki ("Plochocki") sold 88,500 of his shares during the Relevant Period for $43.99 per share. In using his knowledge of the Company's undisclosed information to sell his personal holdings of Quality

Systems common stock at inflated prices, Defendant Plochocki used the Company's proprietary information to his own benefit.

6.     The misrepresentations and insider selling that occurred during the Relevant Period are endemic of a deeper rooted problem at the Company. Defendant Sheldin Razin ("Razin") is the Company's largest shareholder and serves as its non-executive chairman of the Board.  The lack of internal controls at Quality Systems has allowed Defendant Razin to wield complete control over the Company to his own benefit, even if that has meant deceiving the market and destroying the Company's value.

7.     Defendant Razin's dominance over the Board is evidenced in a recently filed lawsuit against him by one of the Company's former directors. The action is captioned *Ahmed D. Hussein v. Sheldon Razin et al.*, Case No. 30-2013-00679600-CU-NP-CJC (Sup. Ct. Orange County) (the "Hussein action").  Mr. Hussein's verified complaint, attached hereto as Exhibit A, details the corporate governance failures at the Company, Defendants' self-dealing, and Defendant Razin's control over the Company (i.e. how the Board is beholden to Defendant Razin).  As a former director pf the Company, Mr. Hussein is uniquely positioned to provide factual detail   For example, Defendant Hussein's complaint reveals that after the Company retracted the guidance issued in the Proxy Materials, during its August 16, 2012 meeting, the Board refused to investigate the discrepancy between the Company's prior projections and its retracted guidance on July 26, 2013.  Exhibit A at ¶71.  The complaint further states that when Mr. Hussein confronted Defendant Plochocki about the issue, Defendant Plochocki replied "he had authorized the prior projections because they were 'even less than what Shelly [Razin] wants.'"  *Id.* at ¶73.  The problems at the Company are so pervasive that according to the Mr. Hussein, the Company's former President and a member of the board of directors, Patrick Cline resigned from the Company's

Board stating that "[a]fter careful consideration I have decided that given the current board environment and company issues, I am unable to help the company." *Id.* at ¶75. Notably, in disclosing Mr. Cline's resignation, Defendants failed to state the reason for his resignation or disclose his resignation letter.

8.     The Individual Defendants have breached and remain in breach of their fiduciary duties. Absent Court intervention, the Company will continue to be harmed. By this complaint, Plaintiff seeks to hold Defendants liable for their failure to maintain proper internal controls, allowing the Company to disseminate materially false and misleading information and depriving shareholders their rights to democratically affect change within the Company, which has caused Quality Systems to suffer, and to further enjoin such conduct. Because Defendants committed the wrongdoing alleged herein, they cannot reasonably be expected to initiate litigation on the Company's behalf. In fact, this would require them to pursue litigation against themselves. Accordingly, Plaintiff, as a non-controlling and independent shareholder of Quality Systems proceeding derivatively on behalf of the Company, is the proper party to prosecute this lawsuit.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction pursuant to 28 U.S.C. §1332(a), as Plaintiff and Defendants are either citizens of different states or citizens of a state and citizens or subjects of a foreign state and the amount in controversy exceeds $75,000 exclusive of interests and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

10.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in, and maintains operations in, this District, or is an individual who has sufficient minimum

contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court under 28 U.S.C. §1391(a) because: (1) one or more defendants either reside in, or maintain executive offices in, this District; (2) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred within this District, and (3) defendants have received substantial compensation in this District by conducting business herein and by engaging in numerous activities that have had an effect in this District.

**THE PARTIES**

**Plaintiff Shareholder**

12.     Plaintiff is a current shareholder of Quality Systems and has been a shareholder of the Company continuously throughout the Relevant Period. Plaintiff is a citizen of the state of Illinois.

**Nominal Defendant Quality Systems.**

13.     Quality Systems is a California corporation based in Irvine, California.  The Company engages in the development and marketing of health care management systems, operating through four divisions (QSI Dental, NextGen, Hospital Solutions, and Revenue Cycle Management (RCM) Services).

**Individual Defendants**

14.     Defendant Craig A. Barbarosh ("Barbarosh") has been a director of the Company since 2009 and serves as Chair of the Board's nominating and governance committee as well as sits on the Board's compensation, transaction, executive personnel, special committees.  Because of Defendant Barbarosh's experience and positions at Quality Systems, his access to internal corporate

documents, conversations and connections with other corporate offices and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith, he knew the non-public information about the business of Quality Systems.   Plaintiff is informed and believes that Defendant Barbaraosh is a citizen of the State of California.

15.   Defendant George H. Bristol ("Bristol") has been a director of the Company since 2008.   Defendant Bristol is chair of the Board's audit committee as well as a member of its transaction, executive personnel and special committees.   Because of Defendant Bristol's experience and positions at Quality, his access to internal corporate documents, conversations and connections with other corporate offices and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith, he knew the adverse non-public information about the business of Quality Systems, its finances, and present and future business prospects, as well as its lack of internal controls. Upon information and belief, defendant Bristol is a citizen of either the State of Rhode Island or Connecticut.

16.   Defendant John C. Malone ("Malone") has served as a director of the Company since 2013.   Upon information and belief, Defendant Malone is a citizen of the State of Washington.

17.   Defendant Peter M. Neupert ("Neupert") has served on the Board since 2013. Upon information and belief, Defendant Neupert is a citizen of the State of Washington.

18.   Defendant Morris Panner ("Panner") has been a director of the Company since 2013.  Upon information and belief, Defendant Panner is a citizen of the State of Massachusetts.

19.     Defendant D. Russell Pflueger ("Pflueger") has served as a director of the Company since 2006.   Defendant Pflueger is chair of the Company's compensation committee and a member of its executive personnel, audit and special committees.   Because of Defendant Pflueger's experience and position at Quality Systems, his access to internal corporate documents, conversations and connections with other corporate offices and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith, he knew the adverse non-public information about the business of Quality Systems, its finances, and present and future business prospects, as well as its lack of internal controls. Upon information and belief, Defendant Pfueger is a citizen of the State of California.

20.     Defendant Plochocki has been a director of the Company since 2004 and has served as its Chief Executive Officer since August 16, 2008.  He has also served as the Company's President since January 25, 2012.  Because of Defendant Plochocki's experience and position at Quality Systems, his access to internal corporate documents, conversations and connections with other corporate offices and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith, he knew the adverse non-public information about the business of Quality Systems, its finances, and present and future business prospects, as well as its lack of internal controls. Defendant Plochocki participated in the issuance of improper statements, including the preparation of improper press release and filings with the SEC.  Upon information and belief, Defendant Plochocki is a citizen of the State of California.

21.     Defendant Razin is the founder of Quality Systems and has served as its Chairman of the Board since 1974.  Defendant Razin was formerly the Chief

Executive Officer of the Company but his employment was terminated by the Company's Board in March 2000.  Defendant Razin is the chair of the Company's transaction committee and sits on its special committee and executive personnel committee as well.   Defendant Razin is the Company's largest shareholder, owning approximately 17.1% of the Company's stock.   Because of Defendant Razin's experience and position at Quality Systems,   his access to internal corporate documents, conversations and connections with other corporate offices and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith, he knew the adverse non-public information about the business of Quality Systems, its finances, and present and future business prospects, as well as its lack of internal controls. Defendant Razin participated in the issuance of improper statements, including the preparation of improper press release and filings with the SEC. Upon information and belief, Defendant Razin is a citizen of the State of California.

22.    Defendant Lance E. Rosenzweig ("Rosenzweig") has been a director of the Company since 2012.  Defendant Rosensweig serves on the Company's compensation, transaction, executive personnel and special committees.   Upon information and believe, Defendant Rosenzweig is a citizen of the State of California.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

23.    By reason of their positions as officers and directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.   The Individual Defendants were, and are,

required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

24.     Each director and officer of the Company owes to Quality Systems and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

25.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Quality Systems, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their executive, managerial and directorial positions with Quality Systems, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and misrepresentations made.

26.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of Quality Systems, and was at all times acting within the course and scope of such agency.

27.     To discharge their duties, the officers and directors of Quality Systems were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the

Company.  By virtue of such duties, the officers and directors of Quality Systems were required to, among other things:

a.     manage, conduct, supervise and direct the business affairs of Quality Systems in accordance with all applicable laws;

b.     neither violate nor knowingly permit any officer, director or employee of Quality Systems to violate applicable laws, rules and regulations;

c.     establish and maintain systematic and accurate records and reports of the business and affairs of Quality Systems and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d.     neither engage in self-dealing nor knowingly permit any officer, director or employee of Quality Systems to engage in self-dealing;

e.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f.     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g.     properly and accurately guide investors and analysts regarding the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

h.     remain informed of how Quality Systems conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

28.    Each of the Individual Defendants, by virtue of his or her position as a director and officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of the Individual Defendants alleged herein involves violations of their obligations as directors and officers of Quality Systems, the absence of good faith on their part and a reckless disregard for their duties to the Company and its shareholders. The Individual Defendants were aware or should have been aware that this posed a risk of serious injury to the Company.  The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining Director Defendants who collectively comprised all of Quality Systems' Board during the Relevant Period.

29.    The Individual Defendants breached their duties of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein, and by failing to prevent employees and/or officers of the company from taking such illegal actions.   In addition, the Company is now the subject of class action litigation alleging violation of federal securities laws, which necessitates that the Company incur excess costs arising from the Individual Defendants' wrongful course of conduct.

30.   Additionally, Quality Systems has established a Code of Business Conduct and Ethics (the "Code") that applies to all employees of the Company. The Code among other things provides that:

- Obeying the law, both in letter and in spirit, is the foundation on which this Company's ethical standards are built. All employees must respect and obey the laws of the cities, states and countries in which we operate

31.   With respect to the accuracy of record keeping and disclosures, the Code provides:

Record Keeping

The Company requires honest and accurate recording and reporting of information in order to make responsible business decisions. For example, only the true and actual number of hours worked should be reported.

Many employees regularly use business expense accounts, which must be documented and recorded accurately. If you are not sure whether a certain expense is legitimate, ask your supervisor or your Divisional Head.

All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform both to applicable legal requirements and to the Company's system of internal controls. Unrecorded or off-the-books funds or assets should not be maintained, unless permitted by applicable law or regulation.

32.   With respect to Insider Trading the Code provides:

Employees who have access to confidential information are not permitted to use or share that information for stock trading purposes or for any other purpose except the conduct of our business. All material non-public information about the Company should be considered confidential information. To use non-public information for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is not only unethical but also illegal. In order to assist with

compliance with laws against insider trading, the Company has adopted a specific policy governing employees trading in securities of the Company.

33.     Moreover, the Audit Committee's Charter as amended and approved by the Board on January 29, 2004 sets forth the additional duties and responsibilities of the Audit Committee of the Board among which are to:

1.     Review and reassess the adequacy of this Charter annually and recommend any proposed changes to the Board of Directors for approval.

2.     Review and discuss with management and the independent auditor the annual audited financial statements, including disclosures made in management's discussion and analysis, and recommend to the Board of Directors whether the audited financial statements should be included in the Company's Form 10-K.

3.     Review and discuss with management and the independent auditor the Company's quarterly financial statements prior to the filing of its Form 10-Q, including the results of the independent auditor's review of the quarterly financial statements.

4.     Review and discuss reports from the independent auditors on:

(a) All critical accounting policies and practices to be used.

(b) All alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor.

(c) Other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

5.     Discuss with the independent auditor the matters required to be discussed by Statement on Auditing Standards No. 61 relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities

or access to requested information, and any significant disagreements with management.

6. Review disclosures made to the Audit Committee by the Company's CEO and CFO during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

34. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

35. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did:

(a) Conceal the fact that the Company was improperly misrepresenting its financial results in order to allow Defendants to artificially inflate the price of the Company's shares;

(b) Maintain the Individual Defendants' executive and directorial positions at QUALITY SYTEMS and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and

(c) Deceive the investing public, including shareholders of Quality Systems, regarding the Individual Defendants' management of Quality System's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period.

36.   In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

37.   The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

38.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## **BACKGROUND**

39.   Quality Systems and its wholly owned subsidiaries operate in four business divisions which are comprised of: (i) the QSI Dental Division, (ii) the Next Gen Division, (iii) the Hospital Solutions Division, and (iv) the RCM Services Division.  The Company derives revenue primarily from developing and marketing healthcare information systems that automate certain aspects of medical and dental practices and in between 2000 and mid-2011 the Company experienced significant growth due primarily to the success of its NexGen business unit.

40.   The Company's NextGen business unit is the product of the Company's 1996 acquisition of Clinitec.  Patrick Cline, the former interim Chief

Executive Officer of Quality Systems and President of Quality Systems was a co-founder of Clinitec and after Clinitec was acquired in 1996 it was combined with another company to form the basis of Quality Systems NextGen business unit. Under the leadership of Patrick Cline, the NextGen business unit flourished, becoming one of the leaders in the development and provision of electronic health records.  Between 2000 and 2009 the NextGen business unit grew by 1300%. The unit ultimately accounted for approximately 95% of Quality Systems revenues and profits and this was reflected in the Company's stock price. However, according to Mr. Hussein's complaint the NextGen unit began to falter when Mr. Cline resigned his position in 2011 after being frustrated with Razin's decision making and the steps he had taken to exert control over the NextGen. Exhibit A, at 6.

41.    Quality Systems' ability to generate future revenue was integral to the value of its stock.  During the Relevant Period the Company repeatedly touted its growth prospects.  In 2012, Defendant Plochocki emphasized that the Company's stock was a good investment because the Company had exceeded analysts' expectations for five consecutive quarters and analysts in turn recommended the Company stock due to its growth profile.  But by May 2011, Mr. Cline's resignation combined with concern with that Quality Systems had saturated its principal markets led the market to question whether the Company's historical growth rates could be maintained.  For example, Oppenheimer stated investors had begun to question whether "peak multiples may be behind us."

42.    To reassure the market and maintain the Company's stock price the Individual Defendants engaged in a scheme of misrepresenting earnings and guidance projections.

**THE INDIVIDUAL DEFENDANTS' CAUSE OR ALLOW THE**
**COMPANY TO MAKE FALSE AND MISLEADING STATEMENTS**
**DURING THE RELEVANT PERIOD**

43.     The Relevant Period begins on May 26, 2011.  On this date, the Company held an analyst conference call to report its quarterly results for the fiscal 2011 quarter.  During the call, Defendant Plochocki stated that Quality Systems was "in agreement with the consensus view of analysts in terms of their projections for revenues for fiscal year 2012."  Similarly, on July 28, 2011 Defendant Plochocki again stated the Company was "in agreement with the consensus view of the analysts for revenue and earnings per share."

44.     On October 27, 2011, Quality Systems held an analyst conference call to discuss its results for the fiscal 2012 second quarter.  During this conference Defendant Plochocki stated:

> As a result of our strong first-half performance and our confidence in the second half of this year, we are now prepared to up our general views for the year. More in line with consensus views, we are now in general agreement with a revenue range of growth of 21% to 24% for the year and an BPS range of growth of 29% to 33% for the year. This is an upgrade fi40m our previous views of 20% to 23% revenue growth and ... 28% to 32% BPS growth. Our confidence is strong, we're bullish on our second half[.]

45.     Moreover, in response to an analyst's question about whether the Company's raised guidance was conservative, Defendant Plochocki responded that the guidance was "quite conservative."

46.     Less than one month later, *Investor's Business Daily* published an interview with Defendant Plochoki, on November 7, 2011.  The article was titled "Quality Systems Chief Says the Company's Business Boom Just Getting Started."  During the interview, Defendant Plochocki was questioned about the market's concern that the Company's business may be slowing.  He emphatically

denied this in the article which stated "Plochocki said worries about flattening and saturation were baseless. 'There is nothing drying up and there is nothing slowing down,' he said."

47.   On January 9, 2012, Defendant Plochocki attended a JPMorgan Global Health Care Conference. At this conference Defendant Plochocki once again affirmed the upwardly revised fiscal 2012 guidance stating:

> We are earmarked for a very strong year. Our fiscal year ends March 31, and we have given analysts prognostications for ...earnings per share growth [in the] 29% to 34% range.

48.   Then, on January 26, 2012, the Company held an analyst call to discuss its results for the third fiscal quarter of 2012.   On the call Defendant stated:

> Our pipeline continues to build to record levels. As leads, RFPs online demos, web hits continue to accelerate throughout all of our business units, we're setting a very strong foundation for what we believe is going to be a powerfully robust period here in the second 24 year of the stimulus movement.

49.   During the January 26 call an analyst noted that the Company had reported higher level guidance to which Defendant Plochocki responded:

> I think the guidance that we provided last quarter was 21 % to 24% revenue growth for the year. That's the year that will be ending in two months. And then our EPS, I think we upgraded to 29% to 4 34%. And actually, quite honestly, we probably have a pretty good shot at 35% on that bottom one. And then, of course, we'll be announcing guidance on our next call for our fiscal year 2013.

50.   Defendant Plochocki continued touting the Company's future growth prospects during UBS's February 7, 2012 Global Health Care Services Conference.  At the conference Defendant Plochocki stated:

> Our sales pipeline; we have $183 million worth of pipeline, the business we intend to close within the next six to eight months. That sales pipeline

has grown every quarter since the announcement of the stimulus bill back in February of 2009 and we view it as continually growing as a result of the fact that the leads that continue to come into our system, the RFPs, are building a strong base along those areas.

51.     Defendant Plochocki's public comments described above were false and misleading because the financial results and guidance contained therein did not comply with GAPP standards and relevant SEC regulations.  The Company was experiencing a material slow-down yet Defendant Plochocki continued to reaffirm the Company's earnings growth.

52.     On May 10, 2012, the Company filed a Press Release and Form 8-K announcing that it miss it guidance.  At the same time, however, Form 8-K issued highly favorable guidance for fiscal year 2013 and projected earnings per share to grow between 20% to 25% versus the 2012 fiscal year.

53.     Seven days later, on May 17, 2012, the Company held a conference call to discuss its fiscal year results.  During the call Defendant Ploschocki misled investors that the poor 2012 fiscal year results were a one-time event.  Defendant Plochocki stated:

> Our performance for fiscal 2012 fourth quarter was impacted due to delays.  In both the closing of several fourth quarter opportunities, as well as recognition of revenue related to a large customer implementation.  Looking ahead, we remain confident about the growth opportunities, as evidenced by our recent guidance in the 2013 fiscal year. We have stated that we expect revenues to increase 20% to 24%, earnings per share to grow 20% to 25%.
>
> Some of the key dial-movers for our upcoming year include, one, to continue to expand offshore capabilities for software development and back office functions; two, expand our international distribution channel; three, continue to maximize cross-selling opportunities; four, sell more multiple product deals, like the Norton deal that we recently announced; five, expand RCM capabilities to dental and hospital markets; six, move upstream in the hospital sector; seven, be at the forefront of ACO

modeling. At HIMSS in February, we introduced five new products to aid physicians in that effort. Eight, continue to complete and win in the 50% of the market that has yet to adopt electronic medical records. Nine, continue to acquire product and service offerings that supplement or complement our core offerings domestically and internationally.

54.    In responding to an analysts question regarding the Company's ability to meet guidance, Defendant Plochoki responded that the Company was "very confident" that it would meet guidance.    He further stated, "Our fundamentals haven't changed.  Our pipeline keeps growing" and "we believe that we are going to be able to continue to grow at 20/20."

55.    One month later, on June 26, 2012, the Company filed proxy materials with the SEC on Schedule 14A.  The proxy materials contained an open letter to the Company's shareholders signed by Defendants Razin, Plochocki, Barbarosh, Bristol, Pflueger and Rosenzweig (the "June 26, 2012 letter").   The proxy materials were motivated by a potential proxy contest that Mr. Hussein would be waging to nominate a slate of directors of his choosing.   To persuade shareholders to maintain current management, the letter stated the following:

We are proud of our strong record of delivering earnings growth and generating superior returns for our shareholders. We are also confident about our growth prospects. For fiscal 2013, we expect that revenues will increase in the 20-24% range and we expect earnings per share to grow by 20-25%.

56.    These statements however were false and misleading and there was no reasonable basis for the guidance issued.  At the time the letter was published, the Company was already experiencing a material decline.

57.    The pending proxy battle between Mr. Hussein and the Individual Defendants drew the attention of the SEC.  On July 3, 2012, the SEC sent a letter to the Company scrutinizing its proxy materials and stating:

Your proxy materials contain specific projections about the about future performance of Quality Systems. For example, we note the following statement: "For fiscal 2013, we expect that revenues will increase in the 20-24% range and we expect earnings per share to grow by 20-25%. Please provide support for these very specific projected figures by describing the assumptions underlying them, including any limitations on those assumptions or other factors that may cause them not to be realized. You may include such support in the proxy statement itself, or in revised additional proxy materials. Please revise and advise how you will make the necessary changes.

58.    The July 3, 2012 letter further stated:

Support for any statements of fact, such as the earnings and revenue figures that appear in your proxy materials, must appear in the materials themselves or be provided supplementally to the staff. At a minimum, in your response letter, provide cites to the periodic reports or other filings in which such figures are reported.

59.    On July 9, 2012 the Company filed a revised preliminary proxy statement attempting to address the SEC's July 3, 2012 letter.   The revised materials drew even further scrutiny from the agency.   The SEC sent a letter to the Company on July 9, 2012 stating:

Refer to the new disclosure appearing at the top of page 10 of your revised proxy statement. Your criticisms of Mr. Hussein's nominees reference their lack of deep industry knowledge and experience with the Company. However, we note that one of Mr. Hussein's nominees (Mr. Brennan) is a current director and another (Mr. Cline) served as President and Chief Strategy Office of the Company from 2009 until December 2011. With respect to Mr. Cline, explain why you do not believe he is well equipped to serve on the Board, given his prior position with the Company.

60.    The letter further stated:

Refer to comment 15 in our letter dated July 3, 2012 and your response. The revised disclosure on page 5 of the proxy statement added in response to our comment is confusing because the specific projections we cited in comment 15 do not appear there. Comment 15 asked you to provide support and describe the assumptions underlying the very specific projected figures

cited in the comment and included in your prior proxy materials; providing generic support and discussion without the projections themselves is confusing. Please revise or advise.

61.     Despite the SEC scrutiny, the Company reaffirmed its 2013 fiscal year guidance in the Proxy Materials filed on July 13 and 23, 2012.  On July 13, 2012, the Company filed its Definitive Proxy Statement with the SEC on Schedule 14A and on July 23, 2012 the Company filed Additional Definitive Proxy Materials.  Both filings were signed by Defendants Razin and Plochocki and both maintained that in Fiscal 2013 the Company expected earnings per share to grow by 20-25%.

62.     As set forth herein, the Individual Defendants' public statements during the Relevant Period were materially false and misleading because there was no reasonable basis for their positive statements about the Company's purported strong financial conditions and prospects.

## **THE TRUTH EMERGES**

63.     During an earnings call held on July 26, 2012, Defendant Plochocki announced that Quality Systems' net income for the first quarter of fiscal 2013 had declined by 18% from the prior year, and that its diluted earnings per share had declined 19% from the prior year.  Defendant Plochocki said the results were attributable to "lower than expected revenue from large, higher margin software system sales."  Defendant Plochocki also stated that the Company was retracting the earnings guidance that had been provided in May, June and July 2012, and reaffirmed less than two weeks earlier on July 13, 2012.  He stated Quality Systems was "not affirming our previous guidance nor providing revised guidance at this time."  This retraction, without any explanation of any change in the Company's prospects that could account for the deviation from the earnings guidance that the company had re-affirmed as recently as just thirteen days earlier,

destroyed the credibility of the Company and the value of its shares in the marketplace, causing a 36.3% price drop in one day and causing the company to trade at a substantial discount to the price to earnings ratios at which its key competitors were trading.

64.    The retraction of Quality Systems' previously issued earnings guidance, without any explanation or the identification of any change in the company's sales or financial performance during the thirteen-day period since it had last re-affirmed its fiscal 2013 earnings guidance, came as a total shock to the market. On July 26, 2012, QSI's stock price immediately plunged from $23.63 per share to $15.04 per share.

65.    The Individual Defendants, by their fiduciary duties of care, good faith and loyalty, owe Quality Systems and its shareholders a duty to ensure that the Company's public statements fairly presented, in all material respects, Quality Systems, as well as issues material to the Company's management, internal controls, disclosures and operations.

66.    The Individual Defendants had a duty to ensure that the Company had proper internal controls and reporting systems.  Yet, instead of addressing the deficiencies in the reporting systems at the Company, the Individual Defendants chose to misrepresent the Company's financial health.   As a result of the Individual Defendants' actions, Quality Systems' stock has plummeted and the Company has been significantly injured.

## A HISTORY OF POOR GOVERNANCE

67.    The Individual Defendants scheme to mislead the market regarding Company's growth prospects were enabled by their failure to implement appropriate corporate governance practices at the Company.

68.    Defendant Razin held the Chief Executive Officer position at the Company until March 2000 when, according to Mr. Hussein, he contravened

provisions of a prior Memorandum of Understanding he had entered by seeking to sell the Company without giving prior notice to or getting approval from the Company's then existing board of directors. Exhibit A at ¶35. The Board issued a written reprimand of Defendant Razin and his position was filled by Mr. Cline. However, due to his large share ownership, Defendant Razin remained on the Board. According to Mr. Hussein, after his removal as CEO, Defendant Razin began taking steps to reassert his control over the Board and establish himself as the Company's *de facto* CEO.

69. In 2004, Defendant Razin orchestrated the appointment of a new slate of directors beholden to him. *Id* at ¶37. Two of the four members of Company's nominating committee formed a subcommittee and nominated directors supported by Defendant Razin. *Id.* This was done without the approval of the full board or a majority of the independent directors or the full nominating committee. *Id.* Once Defendant Razin's new slate of directors was appointed they proceeded to adopt amendments to the Company's by-laws to reclassify Defendant Razin as an "independent director" despite the fact that he is the Company's largest shareholder. *Id.* at ¶38. This allowed Defendant Razin to participate in the corporate decision making functions that were to be controlled by the Company's independent directors.

70. Defendant Razin also had his new slate of directors increase the size of the Board to include two members of the Company's management team which further consolidated Defendant Razin's control by ensuring a majority of the Board would consist of interested directors he had selected. *Id.* at ¶39. Defendant Razin then embarked on a series of actions to further consolidate his power over the Company. Mr. Hussein's complaint summarizes these actions and states, in relevant part that Defendant Razin actions included, among other things:

- Restructuring the composition of board committees to increase Razin's power and influence over the company by ensuring that all committees would be chaired by the directors most closely aligned with Razin and that there would be no ability for Hussein or his nominees influence corporate decision making;

- Circumventing a decision, approved by a 6-1 vote at a special board meeting held in June 2004, to replace the corporate counsel chosen by Razin with a new independent counsel and to retain the new counsel to investigate inaccuracies in board minutes and legal recommendations prepared by the prior counsel by causing QSI management to fail to fund the retainer for the independent counsel;

- Changing corporate by-laws to place decision making power in so called "independent directors' committees" controlled by Razin that were independent in name only, while excluding Hussein from participation in those committees;

- Substantially increasing the compensation packages for QSI executives under which the executives would receive significantly higher compensation than they had previously even if the company's business performance deteriorated;

- Substantially increasing the compensation packages for QSI directors to levels far in excess of the amounts QSI directors had previously made, and more than ten times in excess of the compensation that the directors were to have received when they joined the board; and

- In early August 2012, NextGen president Scott Decker, one of the key executives along with Cline in the NextGen business that had been responsible for the growth of QSI, informed Razin and QSI management and his subordinates that he was resigning from the company because of objections to Razin claiming the status of an independent director while maintaining an office in the company and functioning as its CEO. Razin and Plochocki did not inform the full QSI board of this fact and delayed announcing Decker's resignation until after the contested board election at the annual shareholders meeting held in mid-August 2012. Razin and Plochocki engaged in this subterfuge in order to ensure the election of Razin's slate of directors, thereby depriving Hussein and the company's shareholders of the right to a fair and informed election.

*Id.* at ¶40.

71.    Thus, Defendant Razin has been able to consolidate power his at the Company.  According to Mr. Hussein's complaint, without Board authorization Defendant Razin maintains an office at Quality Systems, controls and directs the uses of the Company's facilities and resources and manages the Company on a day-to-day basis. *Id.* at 60.

72.    Defendant Razin has readily abused his power at the Company in order to engage in self-dealing based on false premises and on unreasonable terms.  For example, in May 2010, Joseph Davis, an independent director of the Company alerted the Company's Board that Defendant Razin had for the prior seven years falsely certified that he was a full-time employee of the Company in order to obtain health insurance for himself and his wife under the Company's benefit plan.   *Id.* at ¶46.   The claims conflicted with Defendant Razin's contemporaneous claims that he was an independent director of the Company. Mr. Davis proposed an independent investigation of the issue.  *Id.*  The proposal was seconded by Mr. Hussein but was voted down by Defendant Razin and the directors aligned with him.  Defendant Razin cast the deciding vote and did not recuse himself despite being self-interested.  *Id.*  Notably, Mr. Davis was not nominated for re-election to the Company's Board.

73.    Similar to the health benefits he put in place for himself, Defendant Razin had the Board approve a resolution under which he and his wife would receive life insurance benefits.  *Id.* at ¶47.  Defendant Razin had the Company's corporate counsel draft the resolution without getting prior authorization from the Board to do so and the arrangement contravenes the Company's 2000 severance agreement with him under which he was only to receive insurance for three years following his termination. *Id.* at ¶40

74.    Perhaps, Defendant Razin's most brazen actions come from his oversight of the Proxy Materials.   The Company's SEC filings provide the

following with respect to the Special Committee responsible for its proxy materials:

> We have recently been subject to proxy contests, the use of cumulative voting rights and litigation brought against us by a former director, Mr. Hussein. In light of this history, on May 26, 2010, our Board formed a Special Committee to address matters of this type. Among other things, the Special Committee has been authorized to act on our Board's behalf in connection with the solicitation and voting of proxies at the annual meeting, except where the Proxy Voting Committee has been authorized to act, as well as all matters related to any litigation or threat of litigation associated with such meeting and its related activities. The Special Committee currently consists of Messrs. Razin, Barbarosh, Bristol, Pflueger and Rosenzweig.

75.     Defendant Razin formed the Special Committee only with directors who were closely aligned and chosen by him. *Id.* at ¶60. Defendant Razin chaired the Special Committee and signed the Company's proxy materials on behalf of the Special Committee. *Id.* Thus, there was no check to Defendant Razin incorporating the misleading guidance in the Company's Proxy Materials.

**DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS**

76.     Plaintiff brings this action derivatively in the right and for the benefit of Quality Systems to redress injuries suffered, and to be suffered, by Quality Systems as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Quality Systems is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction in this Court that it would not otherwise have.

77.     Plaintiff will adequately and fairly represent the interests of Quality Systems and its shareholders in enforcing and prosecuting its rights.

78.     Plaintiff is an owner of Quality Systems common stock and was an owner of Quality Systems common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

79.     At the time that this action was commenced, the Board consisted of the following nine directors: defendants Craig A. Barbarosh, George H. Bristol, James C. Malone, Peter M. Neupert, Morris Panner, D. Russell Pflueger, Steven T. Plochocki, Sheldon Razin, and Lance E. Rosenweig

80.     As a result of the facts set forth herein, Plaintiff did not made any demand on the Quality Systems Board to institute this action against the Individual Defendants.  Such demand would have been a futile and useless act with respect to each and every one of the Individual Defendants because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

(a)     The Board of Directors lacks independence because they are entangled in a web of corporate interests built around Defendant Razin.  As set forth in detail above, Defendant Razin habitually stands to personally benefit from the ways in which he controls Quality System's operations to the detriment of Quality Systems and its shareholders, and has surrounded himself with a complicit board that will aid him in his self-interested pursuits;

(b)     Defendant Razin is not independent as he is the Company's largest shareholder.  Moreover, he chairs the Special Committee responsible for the misleading guidance contained in the Company's Proxy Materials, signed the Proxy Materials and signed the June 26, 2012 letter containing misleading guidance.

(c)     Defendants Plochocki, Barbarosh, Bristol, Plueger and Rosenzweig are likewise not independent as they sit on the Special Committee

that was responsible for the Company's Proxy Materials and all signed the June 26, 2012 letter containing misleading guidance.

(d)     In addition, the principal professional occupation of defendant Plochocki is his employment with Quality Systems as its CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.  Thus, defendant Plochocki lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.    Moreover, Defendant Plochocki, as described above issued various false and misleading statements regarding Company.  Additionally, Defendant Plochocki is not independent given his insider trading during the Relevant Period;

(e)     Defendant Bristol and Pflueger sit on the Company's audit committee and have a heightened duty to ensure the accuracy in the Company's financial reporting.    As interested members of the Audit Committee these defendants do not stand in a position to independently act in the Company's best interests and are hopelessly conflicted.

(f)     Each member of the Board faces a substantial likelihood of liability for breaching their fiduciary duties of loyalty and good faith as alleged herein, and are therefore incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION

81.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

82.    As alleged in detail herein, each of the Individual Defendants had a duty to ensure that Quality Systems disseminated accurate, truthful and complete information to its shareholders.

83.    Individual Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate materially misleading and inaccurate information to its shareholders through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein.   These actions could not have been a good faith exercise of prudent business judgment.

84.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II

### AGAINST INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR FAILING TO MAINTAIN INTERNAL CONTROLS

85.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

86.    As alleged herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

87.    The Individual Defendants willfully ignored the obvious and pervasive problems with Quality Systems' internal controls practices and procedures and failed to make a good faith effort to correct these problems or prevent their recurrence.

88.    As a direct and proximate result of Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT III

### AGAINST INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY

89.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

90.     Individual Defendants owed and owe Quality Systems fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Quality Systems the highest obligation of good faith, fair dealing, loyalty and due care.

91.     Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

92.     As a direct and proximate result of Individual Defendants' failure to perform their fiduciary obligations, Quality Systems has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

93.     As a result of the misconduct alleged herein, Individual Defendants are liable to the Company.

94.     Plaintiff, on behalf of Quality Systems, has no adequate remedy at law.

### COUNT IV

### AGAINST ALL INDIVIDUAL DEFENDANTS FOR ABUSE OF CONTROL

95.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

96.     Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Quality Systems, for which they are legally responsible.  In particular, the Individual Defendants abused their positions

of authority by causing or allowing Quality Systems to misrepresent material facts regarding its financial position and business prospects.

97.    As a direct and proximate result of the Individual Defendants' abuse of control, Quality Systems has sustained significant damages.

98.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

99.    Plaintiff, on behalf of Quality Systems, has no adequate remedy at law.

**COUNT V**

**AGAINST ALL INDIVIDUAL DEFENDANTS FOR GROSS MISMANAGEMENT**

100.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

101.   The Individual Defendants had a duty to Quality Systems and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Quality Systems.

102.   Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Quality Systems in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Individual Defendants breached their duties of due care, diligence and candor in the management and administration of Quality Systems' affairs and in the use and preservation of Quality Systems' assets.

103.   During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Quality Systems to engage in the scheme complained of herein which they knew had an

unreasonable risk of damage to Quality Systems, thus breaching their duties to the Company.   As a result, the Individual Defendants grossly mismanaged Quality Systems.

**COUNT VI**

**AGAINST DEFENDANT RAZIN FOR UNJUST ENRICHMENT**

104.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

105.   By his wrongful acts and omissions, Defendant Razin was unjustly enriched at the expense of and to the detriment of Quality Systems.

106.   Plaintiff, as a shareholder and representative of Quality Systems, seek restitution from Defendant Razin and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by him.

**COUNT VII**

**AGAINST DEFENDANT PLOCHOCKI FOR INSIDER SELLING**

107.   Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.   During the term of the wrongdoing alleged herein, Defendants Plochocki occupied positions with the Company that made them privy to confidential, proprietary information concerning the Company's financial condition and future business prospects.   The foregoing information was a proprietary asset belonging to the Company, which he used for his own benefit and to the detriment of the Company and its shareholders. Notwithstanding his duty to refrain from trading in Quality Systems' common stock under the circumstances, Defendant Plochocki sold his holdings in the Company at artificially inflated prices prior.

108.   The adverse, non-public material information regarding the Company's current and future earnings prospects was proprietary information

belonging to the Company.   In using their knowledge of the Company's undisclosed information to sell his personal holdings of Quality Systems common stock at inflated prices, Defendant Plochocki used the Company's proprietary information for his own benefit.  Since the use of the Company's information for his own gain constitutes a breach of fiduciary duty, the Company is entitled to the imposition of a constructive trust on any profits Defendant Plochocki received from his insider sales.

109.   As a result of his misconduct, Defendant Plochocki is liable to the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.   Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.   Awarding to Quality Systems restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

C.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

D.   Ordering Quality Systems to implement enhanced corporate governance and internal control procedures; and

E.   Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  January 24, 2014            **GLANCY BINKOW & GOLDBERG LLP**

By: _____
Lionel Z. Glancy
Robert V. Prongay
Louis N. Boyarsky
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**THE WAGNER FIRM**
Avi Wagner
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 491-7949
Facsimile:   (310) 694-3967

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile:  (215) 638-4867

## VERIFICATION

I, Timothy J. Foss, do hereby verify that I am a holder of common stock of Quality Systems, Inc. and was a holder of such common stock at the time of the wrongs complained of in the foregoing Verified Derivative Complaint ("Complaint"). I have authorized the filing of the Complaint. I have reviewed the Complaint and all of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: January 23, 2014

Timothy J. Foss

# EXHIBIT A

STEPHEN E. MORRISSEY (187865)
SUSMAN GODFREY L.L.P.
1201 Third Ave, 38th Floor
Seattle, WA 98101-3000
Telephone: (206) 373-7380
Fax: (206) 516-3883

STEVEN G. SKLAVER (237612)
OLEG ELKHUNOVICH (269238)
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-1606
Telephone: (310) 789-3100
Fax: (310) 789-3150

Attorney for Plaintiff

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange
**10/04/2013** at 09:45:56 AM
Clerk of the Superior Court
By Diana Cuevas, Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF ORANGE

| | |
|---|---|
| AHMED D. HUSSEIN,<br><br>        Plaintiff,<br><br>v.<br><br>SHELDON RAZIN, STEVEN PLOCHOCKI, QUALITY SYSTEMS, INC. and DOES 1-10, Inclusive<br><br>        Defendants. | Case No.  30-2013-00679600-CU-NP-CJC<br><br>Judge Luis Rodriguez<br><br>**VERIFIED COMPLAINT FOR DAMAGES FOR:**<br><br>**(1) FRAUD AND DECEIT;**<br>**(2) CONSTRUCTIVE FRAUD;**<br>**(3) NEGLIGENT MISREPRESENTATION**<br>**(4) BREACH OF FIDUCIARY DUTY**<br><br>**JURY TRIAL DEMANDED** |

1

COMPLAINT FOR DAMAGES

2883213v1/013471

Plaintiff Ahmed Hussein ("Plaintiff" or "Hussein"), by his attorneys, alleges as follows on information and belief, except as to those allegations pertaining to his own knowledge and conduct, which are made on personal knowledge:

## INTRODUCTION

1.     For more than twenty years, Plaintiff has been the second largest shareholder of defendant Quality Systems, Inc. ("QSI" or "Quality Systems"), an Irvine-based healthcare information technology company traded on the NASDAQ under the ticker symbol QSII.  He currently owns approximately 5,687,696 shares of QSI stock, 9.6% of the company's total shares outstanding.  Plaintiff suffered enormous losses on his QSI stock on July 26, 2012, when QSI retracted projections of 20%-25% revenue and earnings growth for fiscal 2013 that it had repeatedly made and reconfirmed in public statements made in May, June and July 2012—as recently as just thirteen days before the projections were retracted.  The announcement that QSI was retracting its prior projections shocked the market, causing QSI's stock price to plummet by more than 35% in a single day and causing plaintiff to suffer more than $80 million in losses. Plaintiff seeks to recover those losses from QSI and defendants Sheldon Razin ("Razin"), the founder of the company who now serves as the non-executive chairman of QSI's board of directors and *de facto* CEO of the company, and Steven Plochocki ("Plochocki"), the company's CEO.  Razin and Plochocki orchestrated a course of wrongful and fraudulent conduct and breaches of fiduciary duty that culminated in the dissemination in May, June and July 2012 of fiscal 2013 projections of 20%-25% revenue and earnings growth.  Those projections were factually baseless when they were made and were retracted less than two weeks after they were last reaffirmed. By this action, plaintiff seeks to hold Razin, Plochocki and QSI responsible for their wrongful conduct and to recover the enormous losses he suffered as a result of that conduct.

2883213v1/013471

## NATURE OF THE ACTION

2.     QSI develops and markets computer-based practice management and electronic health records solutions for and to medical and dental groups and hospitals throughout the United States.

3.     Razin founded QSI in 1974, is the company's largest shareholder, and serves as the non-executive chairman of the board of directors. Razin wields complete control over QSI's business to further his own interests and desires, and in recent years his actions have destroyed much of the value of the company. Despite lacking any authority under the company's by-laws to manage QSI's day-to-day affairs—and despite the fact that he was ousted from his prior position as QSI's CEO as a result of his misconduct—Razin works in concert with Plochocki and his other hand-picked officers and directors to exert control over all aspects of the company's decision making, functioning as the *de facto* CEO.

4.     Under the leadership of Patrick Cline ("Cline"), the founder of a company that was acquired by QSI in 1996 and combined with another acquired company to become QSI's NextGen business unit, QSI became one of the industry's leaders in the development and provision of electronic health records. As a result of the success of Cline's NextGen business unit, QSI enjoyed a sustained period of growth between 2000 and 2011. Between 2008 and 2011, also as a result of the success of Cline's NextGen business unit, QSI's revenues and earnings grew 20% per year, and the company's stock price and market capitalization more than doubled. By the end of that period, Cline's NextGen business unit, which was run autonomously from the overall company until 2011, accounted for approximately 95% of QSI's revenues and profits. On September 30, 2011, QSI's stock price peaked at $50.70, with a market capitalization in excess of $3 billion.

5.     Beginning in mid-2010, Razin started implementing plans to consolidate his complete control over QSI. For instance, Razin decided to sub-divide the successful NextGen business unit into separate inpatient and ambulatory divisions,

COMPLAINT FOR DAMAGES

2883213v1/013471

and determined that a less experienced sales team, rather than the experienced and proven NextGen sales team, would not be responsible for servicing the company's new Hospital Solutions Divisions.  These business decisions, which Razin forced through without significant discussion by or disclosure to the board of directors, made no strategic sense in light of an ongoing wave of consolidation in the healthcare industry and were implemented solely to facilitate Razin's effort to assert further control over the company.

6.    Frustrated with Razin's decision making, and with the steps he had taken to exert control over the NextGen business unit that had provided the foundation for QSI's growth, Cline announced that he would resign from QSI at the end of 2011. Most of the other executives who were part of the successful NextGen senior management team left the company during the ensuing months.  Following Cline's resignation announcement and the implementation of the changes in QSI's strategic plans described above, QSI management, under Razin's direction, sought to perpetuate the market perception that the company was positioned to continue to grow and thrive, when in fact the opposite was happening.   For instance, on November 7, 2011, defendant Plochocki told *Investor's Business Daily* that "worries about flattening and saturation" in the healthcare software market "were baseless." According to Plochocki, "there is nothing drying up and there is nothing slowing down."

7.    At a meeting of the QSI board of directors on January 25, 2012, which plaintiff attended, Plochocki delivered a presentation in which he stated that QSI's growth was "rivaled only by Apple," and said that the company expected to achieve 30% revenue and net income growth during its 2013 fiscal year, which began on April 1, 2012.

8.    The company reaffirmed its highly favorable FY2013 projections in a series of statements made by company representatives, under Razin's direction and with Razin's approval, during the spring and summer of 2012:

4

COMPLAINT FOR DAMAGES

2883213v1/013471

- During a May 17, 2012 earnings call held in conjunction with the release of QSI's fourth quarter and year-end results for the 2012 fiscal year, Plochocki stated that "[w]e remain confident about the growth opportunities, as evidenced by our recent guidance for the 2013 fiscal year.  We have stated that we expect revenues to increase 20 to 24%, and earnings per share to grow 20 to 25%."

- During the same May 17, 2012 earnings call, Paul Holt, QSI's CFO, stated that QSI's fiscal 2013 "guidance range of 20 to 24% revenue growth includes expected growth in all of our business segments and revenue categories," and that QSI was "confident in our ability to deliver on this guidance, which is very consistent with our five year compound annual growth rate of 23%."

- In proxy materials filed with the SEC on June 26, 2012 containing an "Open Letter to Quality Systems, Inc. Shareholders," which was signed by Razin, Plochocki and five QSI directors aligned with QSI management, QSI again stated that it was "confident about our growth prospects," and that "[f]or fiscal 2013, we expect that revenues will increase in the 20-24% range and we expect earnings per share to grow by 20-25%."

- In its definitive proxy statement filed with the SEC on July 13, 2012, QSI stated that "for fiscal 2013, we expect that revenues will increase in the 20%-24% range and we expect earnings per share to grow by 20-25%." QSI further stated that its projections were based on "an annual planning and budgeting process and a continuous reforecasting process."

9.     The statements in the July 13, 2012 proxy statement were made even after QSI received a July 3, 2012 comment letter from the SEC which noted that the proxy materials "contain[e]d very specific projections about the future performance

of Quality Systems," and requested that the company "provide support for these very specific projected figures by describing the assumptions underlying them, including any limitations on those assumptions or other factors that may cause them not to be realized." The SEC letter cautioned that "[s]ince the company and its management are in possession of all facts relating to the company's disclosure, they are responsible for the accuracy and adequacy of the disclosures they have made."  In a follow-up letter on July 9, 2012, the SEC commented that revised language proposed by QSI provided only "generic support and discussion" and was "confusing."  QSI, at Razin's direction, nonetheless issued the July 13, 2012 proxy statement containing the same projections for its 2013 fiscal year, without any meaningful description of the assumptions on which the projections were based or any factors that could cause the projections not to be realized.

10.   At the time of the statements cited above in paragraphs 6 through 8, Razin and QSI management sought to reassure the market and QSI's shareholders regarding the financial condition and prospects for the company following Cline's departure and the company's announcement in May 2012 of disappointing earnings numbers for the fourth quarter of 2012.   QSI's stock price had begun drifting downwards at the end of March 2012, decreasing by 45.9% over the span of four months, from $43.73 per share on March 30, 2012 to $23.63 on July 25, 2012.

11.   But contrary to the public pronouncements and private statements made to plaintiff at board meetings regarding QSI's financial performance and projected growth, QSI's revenues and net income in fact were decreasing, not increasing, and the growth projections it had repeatedly trumpeted were in fact completely baseless. During the earnings call on July 26, 2012, Plochocki announced that QSI's net income for the first quarter of fiscal 2013 had declined by 18% from the prior year, and that its diluted earnings per share had declined 19% from the prior year. On behalf of QSI, Plochocki also retracted the earnings guidance that had been provided

2883213v1/013471

and reaffirmed in May, June and July 2012, and stated that QSI was "not affirming our previous guidance nor providing revised guidance at this time."

12.    No one on QSI's management team provided any explanation how or why QSI's actual financial expectations could have deteriorated to such a degree since it made the projections it made in May and June and reaffirmed in the definitive proxy statement it filed on July 13, 2012, *almost two weeks after the end of the first quarter and just thirteen days before the earnings release*, that the company was retracting the earnings forecasts altogether.   Given that QSI engages in what it describes as a "continuous reforecasting process" based on real-time information concerning QSI revenues and income, the true facts concerning QSI's business performance must have been known to Razin and his management team when the earlier statements were made. But QSI nonetheless made projections that lacked any objective basis, and in fact were totally inconsistent with QSI's actual business performance at and before the times the projections were disclosed.

13.    The retraction of QSI's previously issued fiscal 2013 earnings guidance in July 2012 came as a total shock to the market and undermined the credibility of QSI's management team.   Following the July 26, 2012 earnings release, and the shock to the market resulting from QSI's retraction of its earnings guidance, QSI's stock price immediately plunged from $23.63 per share to $15.04 per share, a one-day drop of more than 36.3% that wiped out hundreds of millions of dollars from the market value of the company, causing plaintiff more than $80 million in losses.

14.    Plochocki personally profited from the artificial inflation of QSI's stock price during the first half of 2012.   Plochocki—who was privy to real-time information regarding QSI's actual financial performance sales pipeline—sold QSI stock while the price was artificially inflated as a result of the failure to disclose the company's true financial condition.   On February 23, 2012, Plochocki sold 88,500 shares of QSI stock, which was almost all of his holdings, for $43.99 per share, a price near the all-time high.   If Plochocki had retained his shares through the July

2012 earnings release, his shares would have been worth less than 35% of the price he obtained.

15.     Plaintiff has been a shareholder of QSI since shortly after its initial public offering in 1982, and served as a director of the company from 1999 until May 2013. As of July 2012, plaintiff held 9,333,700 shares of QSI stock, approximately 15.7% of the company's outstanding shares, and was the company's second largest shareholder.  Plaintiff remains the company's second largest shareholder to this day. Hussein accepted Razin's invitation to join the board in 1999 based on Razin's commitment to adopt corporate governance reforms designed to limit Razin's control over the company and provide independent oversight over corporate decision making.  Since joining the board, Hussein has advocated strategic business decisions and corporate governance reforms that, he believes, would have significantly increased the value of the company.  For many years, plaintiff had expressed concerns about QSI's corporate governance practices, its failure to abide by the procedural safeguards in the company's by-laws, the QSI board of directors' refusal to provide any meaningful oversight over Razin and QSI management, and Razin's unchecked control over corporate decision making.  Although plaintiff's ownership stake in the company was nearly as large as Razin's, Razin has long ignored plaintiff's input and prevented plaintiff from meaningfully participating in the company's affairs. Although Hussein served on QSI's board of directors, he, unlike Razin and his management team, was not privy to real-time internal information regarding the company's growth model and its projected sales and financial performance, and instead relied on the accuracy of the information that was provided in the company's public statements and in information provided to him as a member of the QSI board of directors.

16.     Due to ongoing disagreements with Razin and the QSI board of directors regarding management and corporate governance issues, plaintiff considered selling his QSI stock and discussed a potential sale of his stock with his

investment bankers in late 2011 and early 2012; he disclosed the possibility of selling his QSI stock in a November 10, 2011 13D filing.  Ultimately, he decided to retain the stock based on representations regarding QSI's expected future growth that were made by QSI management and that turned out to be totally baseless.

17.    On June 15, 2012, plaintiff informed QSI's board of directors that he was nominating a rival slate of directors for the company's board of directors, and that he would be sponsoring a proxy contest in support of the election of those directors at the annual meeting that was to be held in August 2012. By reassuring the market regarding QSI's financial condition and growth prospects—and, as further alleged below, by downplaying the management and corporate governance concerns raised by plaintiff and seeking to undermine plaintiff's credibility in the proxy contest through false and misleading statements about plaintiff—Razin and QSI management sought to increase the prospects for the re-election of the incumbent directors and thereby to further consolidate Razin's control over the company.

18.    Plaintiff was completely surprised by the company's CEO's July 26, 2012 retraction of projections which the same CEO had repeatedly provided to the market and reconfirmed as recently as thirteen days earlier.  Although plaintiff had significant concerns about Razin and QSI management, and particularly about Razin's unfettered control over the company and the long-term threat that Razin's decision making posed to the company's potential success, Hussein had no idea that the company's financial projections had no factual basis, as he had relied on Razin's management team to provide truthful and accurate information regarding the company and its actual and projected financial performance. Had he known the truth about QSI's baseless projections, Hussein would have emphasized that fact in the proxy materials he submitted in support of his proposed slate of directors and would have brought the baseless projections to the attention of the company's board and its investors.

COMPLAINT FOR DAMAGES

2883213v1/013471

19.     Following the announcement of QSI's earnings for the first quarter of fiscal 2013 in July 2012, Hussein was forced to sell approximately 3.65 million shares of QSI stock to satisfy a call of an outstanding loan secured by his stock and other assets, and lost tens of millions of dollars on those shares.   Additionally, Hussein has lost tens of millions of dollars on the approximately 5.69 million QSI shares that he continued to hold but would have sold well before July 2012 if QSI management had disclosed accurate information about the company's growth prospects instead of destroying management and company credibility by disclosing projected earnings that had no factual basis.

20.     By this action, Hussein seeks to recover the enormous losses on his QSI investment that were caused by defendants' conduct, and also seeks to hold Razin, current QSI management, and the QSI board of directors to account for fraudulent and other wrongful conduct that has destroyed much of the company's value and caused plaintiff enormous market losses, as well as other tremendous and irreparable harm.

## JURISDICTION AND VENUE

21.     Jurisdiction is proper in this Court because the Superior Court is a court of general jurisdiction and because plaintiff seeks both damages and equitable relief.

22.     Venue is proper in this Court because defendants reside in Orange County, California.

## THE PARTIES

### PLAINTIFF

23.     Plaintiff Ahmed Hussein is a citizen of the United States and Egypt who resides in Cairo, Egypt.   Until July 2012, Hussein owned 9,333,700 shares of QSI common stock, representing approximately 15.7% of the outstanding shares. Following the dramatic drop in QSI's stock price after the earnings release on July

COMPLAINT FOR DAMAGES

2883213v1/013471

26, 2012, Hussein was forced to sell 3,646,004 shares of QSI stock that were held in a margin account. Hussein continues to hold approximately 5,687,696 QSI shares, approximately 9.6% of QSI's outstanding stock, and has been the company's second largest shareholder for more than twenty years.

**DEFENDANTS**

24.     Defendant Sheldon Razin is the non-executive chairman of QSI's board of directors, and is a resident of Orange County, California.   Razin was the founder of QSI and served as its Chief Executive Officer until March 2000, when the QSI Board of Directors terminated his employment following misconduct that included an unauthorized attempt to sell the company and falsely denying that he had done so to the company's board of directors.

25.     Defendant Steven Plochocki is QSI's Chief Executive Officer ("CEO"), and is a resident of Orange County, California.

26.     Defendant QSI is a California corporation based in Irvine, California. QSI is engaged in the development and marketing of healthcare management systems, operating through four divisions (QSI Dental, NextGen, Hospital Solutions, and Revenue Cycle Management (RCM) Services) that serve various sectors of the healthcare industry. QSI is a public company whose shares trade on NASDAQ.

27.     The true names and capacities of defendants named as Does 1-10, inclusive, whether individual, corporate, associate, or otherwise, are presently unknown to plaintiff.   Plaintiff therefore sues these defendants by these fictitious names.   Plaintiff will amend the Complaint to substitute true names and capacities when they have been ascertained.   Plaintiff is informed and believes, and on the basis of that information and belief alleges, that each of the fictitiously-named defendants is responsible in some manner for the occurrences herein alleged.

28.     By reason of their positions and relationships with QSI and plaintiff, including their membership or representation on QSI board of directors, their status

COMPLAINT FOR DAMAGES

2883213v1/013471

as QSI officers, their access to material non-public information concerning QSI, and their control of QSI, defendants were and are fiduciaries to plaintiff.  Defendants owed to plaintiff the obligations of utmost good faith, fair dealing, fidelity, trust, loyalty and due care and were required to use their powers (1) to act in furtherance of the best interests of plaintiff and other shareholders of QSI; and (2) to provide plaintiff with complete and accurate information concerning QSI.

29.    By engaging in the wrongful conduct alleged herein, defendants pursued a common course of conduct, acted in concert with each other, and conspired with one another, in furtherance of their common plan, scheme or design.  In addition, each of the defendants aided and abetted each other in breach of their respective fiduciary duties, as alleged herein.  In aiding and abetting the other defendants' breaches of fiduciary duties, the defendants rendered substantial assistance to the other defendants with knowledge or in reckless disregard of the breaches of duty committed by such defendants.

## FACTUAL BACKGROUND

30.    Hussein has been a shareholder of QSI since around the time of its initial public offering ("IPO") in 1982.  Hussein subsequently purchased additional QSI shares, and had invested in excess of $8 million in the company by the mid-1990s.  Hussein invested in QSI because of a keen interest in the use of technology to improve the delivery of healthcare services, and a belief that QSI had the potential to become a leading player in that field.  Until 1999, despite owning nearly 20% of the company and having the right to elect two directors through cumulative voting, Hussein remained a relatively passive investor in the company, and did not request to be nominated to the company's board of directors, did not exercise his cumulative voting rights, and generally did not involve himself in issues relating to the corporate governance of QSI.

COMPLAINT FOR DAMAGES

2883213v1/013471

31.     Razin, the founder and largest shareholder of QSI, served as QSI's CEO from its inception in 1974 until March 2000, and has served as the Chairman of QSI's Board of Directors from 1974 to the present.

32.     In May 1999, Razin traveled to Egypt to ask Hussein, who then owned 18.5% of the company's outstanding stock, to join the QSI board of directors.  At the time, QSI was embroiled in securities litigation involving allegations that, *inter alia*, Razin had made false statements in connection with the 1996 public offering of QSI stock, as well as a shareholder derivative lawsuit alleging that QSI directors had breached their fiduciary obligations by seeking to entrench themselves and by failing to maximize shareholder value. One of QSI's largest shareholders at the time, Lawndale Capital Management LLC, had filed a Schedule 13D amendment in which it stated that the QSI board of directors had "failed to do its job largely as a result of dysfunctional and not sufficiently independent board composition and a lack of any or poor corporate governance practices." Lawndale had indicated that it would seek changes to QSI's senior management and to the composition of its board of directors, as well as corporate governance reforms.  Hussein agreed to help resolve the dispute if Razin would agree to corporate governance reforms, alleged in more detail below, under which Razin would relinquish his control over the company and agree to have the company managed under the direction of a truly independent board of directors.

33.     On August 6, 1999, Hussein, Lawndale and the company ultimately reached a written Memorandum of Understanding ("MOU"), under which Razin would resign as CEO as soon as a replacement could be found, Razin would remain on the board of directors, and Razin would agree to support the corporate governance reforms requested by Hussein. The corporate governance reforms required by the MOU included, *inter alia*, the creation of an independent board of directors that would be responsible for overseeing the company, the removal of a "poison pill" that reinforced Razin's ability to prevent independent investors from gaining control over the company, the adoption of corporate by-laws that would protect the interests of

13

QSI shareholders, and Razin's resignation from his position as the company's CEO as soon as a replacement could be found.

34.     The corporate governance provisions included in the MOU included requirements that: (i) at least three-quarters of the members of the board of directors would be independent; (ii) the attendance of at least half of the directors would be required for any corporate action to be valid; (iii) the principal committees of the board, including the audit, nominating, compensation and transaction committees, would be comprised solely of independent directors; (iv) a separate meeting of the independent directors would be held at least as frequently as meetings of the full board; and (v) one independent director (which, initially, was Hussein) would serve as the Co-Chairman of the board and the Lead Director whenever the Chairman was not an independent director, preside over committees of the board, and serve on all board committees.  The MOU sought to limit Razin's further influence over the corporation by providing that (i) he would resign his position as CEO as soon as a new candidate was identified and elected; (ii) he would continue to serve as the Chairman of the board of directors for two years, and for any further period only if requested to do so by the board; and (iii) he could not serve on any committees of the board of directors because he was not qualified to serve as an independent director. Under the MOU, any modification or repeal of the corporate governance provisions required a majority vote of the company's shareholders or a two-thirds vote of both the entire board of directors and the independent directors. The MOU stipulated that these corporate governance provisions would become an integral part of the company's by-laws.

35.     Within months after agreeing to the MOU, Razin contravened those restrictions by unilaterally seeking to orchestrate a sale of QSI without prior notice to or approval by the board of directors.  In response to Razin's insubordination, the QSI board of directors, in a unanimous decision supported even by the directors selected by Razin, immediately terminated Razin from the QSI CEO position in

2883213v1/013471

March 2000 and agreed to issue a written reprimand of Razin for his insubordinate violation of the requirements of the MOU.  Razin was replaced by interim CEO Patrick Cline, the head of QSI's NextGen business unit, which had developed out of two acquisitions completed by QSI in the mid-1990's.  However, because he continued to be the largest QSI shareholder, Razin remained on the QSI board of directors.

36.    In 2002, Razin had a dinner meeting with Hussein in Irvine, California, and during that meeting urged Hussein to support a request for the company to re-purchase Razin's outstanding shares. Hussein persuaded Razin that the re-purchase price proposed by Razin was too low, that the company was positioned for tremendous growth, and that Razin would benefit substantially from retaining rather than selling his shares. Razin consequently abandoned the idea of selling his shares and remained on the board of directors.

37.    Following his dinner meeting with Hussein in 2002, and his decision to abandon his plans to sell his QSI stock, Razin began to reassert control over the company.  That effort culminated at the 2004 annual meeting of QSI's shareholders, during which Razin orchestrated the appointment of a new slate of directors who would abide by his instructions, in defiance of the MOU and by-laws of the corporation and the rights of Hussein and the other independent directors under California law.   Razin did so after two of the four members of the nominating committee purported to declare themselves a "subcommittee," despite lacking the required majority support for that proposal, and then proceeded to nominate the directors supported by Razin.  This was done without approval of the full board of directors or a majority of the independent directors or the full nominating committee, in contravention of the corporate governance reforms required by the MOU and the by-laws of the corporation and the rights under California law of the directors who opposed the nominating process, and over the written and vocal objections of a three-

member majority of the independent directors, including two of the four members of the nominating committee.

38.    After securing the appointment of the slate of directors aligned with him at the September 2004 annual meeting, Razin's new slate of directors proceeded to adopt amendments to the corporate by-laws to enable Razin to be deemed an "independent director," notwithstanding his obvious lack of independence. Previously, Razin did not qualify as an independent director, but Razin persuaded his new slate of directors to change the company's by-laws so that, under a newly adopted definition, Razin could be considered independent and participate in the corporate decision making functions that were to be controlled by independent directors under the terms of the MOU.  The decision to revise the by-laws to allow Razin to serve as an independent director was made at a board meeting during which Razin enticed the company's directors to support his proposals with cash payments and stock option grants that provided the directors with substantial compensation worth far in excess of generally accepted levels of director compensation for a company of QSI's size and financial performance and much more than *ten times* the compensation the directors previously received, even though the directors had already been nominated and elected and had accepted their positions based on the previously existing compensation terms.   Notwithstanding the QSI directors' willingness to designate Razin an "independent" director, Razin in fact is not, and never legitimately has been, an independent director, notwithstanding that title, because (1) he founded the company, served as its CEO, served as the Chairman of the company's board of directors throughout its history, and at all times has been its largest individual shareholder; (2) the by-laws of the corporation had, since the inception of the company, precluded any former employee from being considered an independent director; and (3) Razin's son, David Razin, served and functioned as an executive officer of QSI, which under applicable NASD rules precluded Razin from being independent, although David Razin's executive status was inappropriately,

COMPLAINT FOR DAMAGES

inexplicably and surreptitiously modified without board knowledge, discussion or approval to facilitate Razin's effort to become an independent director.

39.    Also following the appointment of Razin's new beholden slate of directors, the board, at Razin's request and with the support of the directors he had selected, and over Hussein's objection, increased the size of the board to add two members of the management team to the board of directors, thereby further bolstering the ability of Razin to exert control over the company by ensuring that a majority of the board would consist of Razin and the interested directors he selected. These changes to the corporate by-laws were totally inconsistent with the MOU, which had been designed to limit Razin's control over the company as a result of his prior conduct.

40.    Since beginning to reassert control over QSI's corporate decision making in 2002, and increasingly after the new slate of directors supported by Razin was appointed in 2004, Razin has used his power over the QSI board of directors to implement a series of decisions that served Razin's interests and reinforced Razin's control over the company, at the expense of the best interests of the company and its shareholders. Those decisions included, *inter alia*:

- Restructuring the composition of board committees to increase Razin's power and influence over the company by ensuring that all committees would be chaired by the directors most closely aligned with Razin and that there would be no ability for Hussein or his nominees influence corporate decision making;

- Circumventing a decision, approved by a 6-1 vote at a special board meeting held in June 2004, to replace the corporate counsel chosen by Razin with a new independent counsel and to retain the new counsel to investigate inaccuracies in board minutes and legal recommendations prepared by the prior counsel by causing QSI management to fail to fund the retainer for the independent counsel;

COMPLAINT FOR DAMAGES

- Denying Hussein any opportunity to serve on standing board committees, while all other independent directors, except Hussein's nominee Murray Brennan, served on two or more committees;
- Changing corporate by-laws to place decision making power in so-called "independent directors' committees" controlled by Razin that were independent in name only, while excluding Hussein from participation in those committees;
- Ignoring the procedural requirements of the MOU by removing Hussein as the Lead Director and replacing him with a director aligned with Razin, even though that decision was not approved by a majority of the independent directors and was thus invalid;
- Refusing to appoint independent counsel to investigate and assess Razin's claimed "independence," notwithstanding repeated requests by Hussein and Hussein's willingness to fund such an investigation;
- Substantially increasing the compensation packages for QSI executives under which the executives would receive significantly higher compensation than they had previously even if the company's business performance deteriorated;
- Substantially increasing the compensation packages for QSI directors to levels far in excess of the amounts QSI directors had previously made, and more than ten times in excess of the compensation that the directors were to have received when they joined the board; and
- In early August 2012, NextGen president Scott Decker, one of the key executives along with Cline in the NextGen business that had been responsible for the growth of QSI, informed Razin and QSI management and his subordinates that he was resigning from the company because of objections to Razin claiming the status of an independent director while maintaining an office in the company and

functioning as its CEO. Razin and Plochocki did not inform the full QSI board of this fact and delayed announcing Decker's resignation until after the contested board election at the annual shareholders meeting held in mid-August 2012. Razin and Plochocki engaged in this subterfuge in order to ensure the election of Razin's slate of directors, thereby depriving Hussein and the company's shareholders of the right to a fair and informed election.

41.     In 2006, Cline, on behalf of QSI, and based on Razin's instructions, approached Hussein to discuss the issues Hussein had raised regarding the contested board election in 2005, the validity of the prior board selection, QSI's corporate governance issues, and QSI's continued use of the corporate counsel who was beholden to Razin despite the prior decision to terminate him and concerns that Hussein had raised regarding the corporate counsel's lack of independence and the accuracy of the minutes and legal recommendation he had prepared.  Ultimately, Hussein and QSI, under Razin's direction, entered into a Settlement Agreement relating to those issues. Under the Settlement Agreement, which resolved a lawsuit that Hussein had previously initiated relating to those issues and his 2005 proxy context, QSI agreed to nominate the independent directors proposed by Hussein, to ensure that one-half of the members of the nominating and compensation committees of the board would be nominated by Hussein, and to terminate the corporate counsel chosen by Razin and appoint new outside counsel from a national law firm to attend board meetings and prepare the minutes of those meetings.  In conjunction with the Settlement Agreement, Razin traveled to New York to meet with Hussein and told him that he viewed Hussein as an important partner in the business, that he would abide by the previously adopted corporate governance reforms, including the termination of Razin's chosen corporate counsel, and that Hussein would chair the transactions committee of the board that would be responsible for considering all material transactions.  Razin never followed through on those commitments, despite

Hussein's requests that he do so. The transactions committee never held substantive discussions regarding any transactions completed after the execution of the 2006 Settlement Agreement, even though Razin and his management team completed several material transactions, including one which ultimately resulted in a write-off of approximately $17.4 million in 2013.

42. After the Settlement Agreement was executed, the company did retain Gibson, Dunn & Crutcher LLP ("GDC") as its new corporate counsel. However, contrary to the main considerations underlying Hussein's decision to enter into the Settlement Agreement, QSI never terminated its prior counsel, and GDC resigned shortly after its appointment. Upon GDC's resignation, Razin's hand-picked personal lawyer continued to serve as corporate counsel, notwithstanding Hussein's objection and contrary to the requirements of the Settlement Agreement. Hussein offered to pay for an arbitrator to determine whether the continued appointment of the prior counsel was consistent with the requirements of the 2006 Settlement Agreement, but Razin and his board refused.

43. Since the 2006 Settlement Agreement, Razin has continued to exploit the lack of any truly independent oversight by the directors he selected to implement significant corporate actions without any prior notice to or direction to the full board and without any regard for the procedural requirements and protections set forth in the company's by-laws. For instance, in September 2009, the QSI board of directors was given two days' notice in advance of a scheduled board meeting of the decision to appoint Philip Kaplan to a new Chief Operating Officer ("COO") position, along with a copy of a proposed employment contract for Kaplan. Until that time, Kaplan had served as an independent director and chairman of the nominating committee, but he resigned those positions shortly before the meeting. Hussein, despite serving as a director, was not given any prior notice of the decision to create the COO position, the nature of the search for a new COO, or the manner in which the terms of

2883213v1/013471

Kaplan's proposed compensation were negotiated and determined to be fair and reasonable.

44.    Just six months later, Razin orchestrated the termination of Kaplan from the newly created COO position in an extraordinarily unusual, flawed and deceptive fashion that was completely lacking in transparency. At the May 26, 2010 board meeting, Razin proposed the creation of a new committee called the "Independent Directors Compensation and Executive Personnel Committee," on which all of the independent directors, including Hussein and his nominee Dr. Murray Brennan, were to serve. The creation of this committee was not on the agenda distributed in advance of the meeting, and the materials for the meeting did not provide any explanation of the reasons for creating this new committee.  Hussein, Brennan and Davis were falsely told by Razin that the only reason to form this new committee was to resolve any disputes between the directors on the compensation committee.  Hussein, Brennan and Davis also were not told that the new committee would have the power to remove corporate officers, and the minutes of the meeting did not reflect that the committee would have such powers or that the committee could be convened without prior notice to its members.  Hussein questioned whether there was any need to form the new committee in light of the fact that the existing compensation committee had three members, and thus could not be deadlocked, and in light of the existence of a standing seven-member independent directors committee that was chartered by the by-laws to resolve disputes between the members of any independent directors committee, including the compensation committee.  Notwithstanding the fact that the committee actually was being formed to execute Kaplan's termination, Razin told directors Hussein, Brennan and Davis that the committee was being formed to resolve disputes among the directors on the compensation committee, and the minutes of the board meeting reflected Razin's false statement of the purpose for forming the committee.

COMPLAINT FOR DAMAGES

45.   Hussein and Brennan had scheduling conflicts that required them to leave prior to the end of the May 2010 meeting.  Before departing the meeting they inquired whether any additional material action was to be taken, and Razin told them that no further action would take place.  However, Razin did not inform Hussein and Brennan that Razin had met with three directors aligned with him the previous day at QSI headquarters and, together with outside counsel and an employment consultant, had discussed and agreed to the termination of Kaplan.  Razin did not bring those prior discussions to the attention of Hussein, Davis or Brennan, and those discussions and the reasons for them were never discussed or approved in advance by the QSI board.  Nothing in the QSI by-laws allowed the use of corporate resources for such a meeting, and proceeding with that meeting without notice to or the involvement of three of the independent directors was a violation of the rights of the three independent directors under California law.  QSI's outside corporate counsel and the members of the board of directors aligned with Razin who were present at the meeting who knew the true purpose for forming the new committee, and the powers that the new committee intended to assert, but remained silent and thus enabled Razin to mislead independent directors Hussein, Brennan and Davis regarding the real reasons for forming the committee.  After Hussein and Brennan left the meeting, Razin immediately convened a meeting of the newly created committee, without any notice to Hussein and Brennan.  At the new committee meeting, Razin proposed asking for Kaplan's resignation, and he did so without any notice to or input from Hussein or Brennan.  Shortly after the meeting, Kaplan resigned. The "Independent Directors Compensation and Executive Personnel Committee" never met again after May 26, 2010, and apparently was created for the sole purpose of facilitating Razin's decision to terminate Kaplan's employment, for reasons that were never explained to Hussein, Brennan, or the full board of directors.

46.   In May 2010, an independent director, Joseph Davis, alerted the QSI board of directors that Razin had, for the past seven years, falsely certified that he

COMPLAINT FOR DAMAGES

2883213v1/013471

was a full-time employee of the company in order to obtain health insurance coverage for himself and his wife under the company's benefit plan.  Razin had accepted those benefits, the value of which totaled at least $75,000, without prior knowledge or approval of the board of directors or any of its committees, and in violation of company policy.  Those false certifications of employment status were, of course, fundamentally inconsistent with Razin's contemporaneous claim that he was qualified to serve as an "independent" director of the company. Davis also suggested that Razin may be using corporate resources for his personal benefit, without board approval. Davis introduced a resolution seeking an independent investigation of Razin and Razin's qualifications to serve as an independent director, which Hussein seconded, and which also was supported by Brennan, but the resolution was voted down by Razin and the directors aligned with him, with Razin casting the deciding vote, even after Hussein volunteered to fund the investigation himself.  Razin did not recuse himself from that vote despite a clear conflict of interest, and he introduced a successful resolution to strike any mention of the resolution from the minutes of the meeting, despite the fact that the resolution proposed by Davis was an agenda item and was voted upon and supported by three of the seven independent directors, or half of the independent directors excluding Razin.

47.    Davis was subsequently not nominated for re-election to the board at the next annual meeting of QSI's shareholders.  After the company became self-insured, the board subsequently approved a resolution, proposed by Razin, under which Razin and his wife receive life insurance benefits.  Without any prior board approval, and consistent with his past practice of using corporate resources for personal ends, Razin directed the company's corporate counsel to prepare the proposal, despite his status as an independent director without any authority to do so. This arrangement also contravened a 2000 severance agreement under which Razin only was to receive insurance for the three years following his termination. Under this new arrangement,

there is no independent check on Razin's receipt of insurance benefits, and the ultimate decision whether to provide him with benefits is under his control.

48.     Razin additionally denied Hussein any meaningful opportunity to participate in QSI's decision making, despite Hussein's substantial ownership of QSI stock and his service as a QSI director. Razin excluded Hussein from the independent directors committees, removed Hussein from QSI board committees, and determined that important decisions regarding QSI's business would be made within independent directors committees from which Hussein was excluded and that were comprised of directors who were hand-picked by Razin and loyal to him.

49.     Between 2004 and 2013, Hussein was not appointed to any board committees except the transaction committee, which he chaired between 2006 and 2008 (a period during which that committee never materially considered any transactions because the QSI board, at Razin's request, transferred the powers of the transaction committee to company management), and the Independent Directors Compensation and Executive Personnel Committee (which, as alleged above, was created in 2010 and met once without prior notice).  In August 2012, Razin created an independent directors executive committee that included all of the independent directors except Hussein.  By excluding Hussein from QSI board committees, while assuring that all meaningful director decisions were made within the committees rather than the full board, Razin excluded Hussein from QSI's corporate decision making and undermined Hussein's rights as a substantial shareholder with a right under California law to representation on the QSI board.

50.     Razin also used the facilities and resources of the corporation, as well as outside resources such as consultants and lawyers, to conduct board committee meetings without notifying Hussein, Brennan or Cline in advance, or providing them with minutes of what had transpired at those meetings.

51.     Razin also has engaged in a longstanding campaign to disparage, belittle and undermine Hussein and the corporate governance concerns he has raised by

24
COMPLAINT FOR DAMAGES

disseminating false and misleading information about Hussein in an effort to undermine Hussein's credibility and reinforce Razin's control over the company. For instance, at Razin's behest, QSI claimed in public filings that Hussein had violated company policy by holding his stock in margin accounts while he served as a director, and falsely suggested that it was previously unaware of Hussein's margin accounts. However, QSI knew Hussein had always held his stock in margin accounts, including long prior to the adoption of any such policy, and in fact had worked with Hussein to establish those accounts in the first place. Razin and his corporate counsel also had engaged in prior unsuccessful efforts over a ten year period to adopt policies restricting the use of margin accounts. Razin and QSI also knew that the company had no right to impose its newly established policy regarding margin accounts on Hussein, who had an unfettered right to serve as a QSI director as a result of his stock ownership and immediately informed the company that he would not abide by the new policy when it was adopted. Additionally, in opposing the slate of director nominees Hussein put forward in his 2012 proxy statement, QSI, at Razin's behest, made false and misleading claims about Hussein and decades-old legal proceedings in which Hussein had been involved in an attempt to undermine Hussein and his reform proposals and impugn Hussein's integrity, motives and character. QSI's actions caused tremendous and irreparable harm to Hussein, including reputational harm in the investor community, financial harm resulting from lost investment opportunities, destroyed business relationships, and financing arrangements that were suddenly cancelled on highly unfavorable terms without prior notice and at inopportune times, and preventing the election of the highly qualified slate of independent directors Hussein had proposed in the 2012 proxy contest.

52.    Razin's actions since 2002 have resulted in the creation of a board of directors and executive management team that is completely beholden to him and totally incapable of standing up to him or providing meaningful oversight over the company. As a result of Razin's actions, the QSI board of directors does nothing to

2883213v1/013471

ensure the validity of the company's business plans, financial and operational results, and financial projections.

53.   Despite Razin's usurpation of the corporate governance reforms that had been implemented at QSI in 1999, and despite the absence of meaningful oversight from the board and management team that were beholden to him, QSI's business actually performed well while Cline and his team were responsible for the operation of the NextGen business.   During Cline's leadership of the NextGen business, that business unit enabled QSI to enjoy a period of sustained growth between 2000 and 2011. Between 2000 and 2009, the NextGen business unit led by Cline grew by 1300%, while the remainder of QSI's business actually shrank by 20%. Cline's NextGen business unit ultimately accounted for approximately 95% of QSI's revenues and profits.

54.   The success of QSI during Cline's leadership of NextGen was also reflected in the company's stock price. Between 2008 and 2011, QSI's revenues and profits grew by at least 20% per year, and the company's stock price and market capitalization more than doubled. QSI's stock price peaked at $50.70 per share on September 30, 2011, reflecting a market capitalization of $3 billion. At that time, Hussein's QSI stock had a market value in excess of $470 million.

55.   In July 2011, as Razin was progressively reasserting control over QSI's operations, and in particularly the NextGen division, Cline announced his resignation from QSI, effective at the end of the year.   Most of the QSI executives involved in the successful NextGen business resigned during the ensuing months. Razin and QSI management recognized that the market viewed Cline and his management team as important to QSI's continued success, and accordingly sought to reassure the market that QSI would continue to grow and thrive under Razin's control.   For instance, in a November 7, 2011 interview, defendant Plochocki, QSI's CEO, told *Investor's Business Daily* that "worries about flattening and saturation" in the healthcare software market "were baseless."   According to Plochocki, "there is nothing drying

up and there is nothing slowing down." Plaintiff read those statements at or around the time they were made, and relied upon them in deciding to retain his QSI stock.

56.     Later, at a meeting of the QSI board of directors on January 25, 2012, which plaintiff attended, Plochocki delivered a presentation in which he stated that QSI's growth was "rivaled only by Apple." Plochocki further said that the company had budgeted for 30% revenue and net income growth during its 2013 fiscal year, which would begin on April 1, 2012.

57.     QSI reaffirmed its favorable revenue and net income projections during a May 17, 2012 earnings call that plaintiff listened to and relied upon in deciding to retain his stock. During that earnings call, Paul Holt, QSI's CFO, stated that QSI's revenue and earnings growth for FY2013 were projected to be in the 20%-25% range.

58.     In a proxy statement issued on June 26, 2012—just four days before the end of the first quarter of QSI's 2013 fiscal year—QSI reiterated that "for fiscal 2013, we expect that revenues will increase in the 20-25% range and we expect earnings per share to grow by 20-25%." Hussein specifically read and relied upon that proxy statement when deciding to refrain from selling his QSI shares.

59.     QSI stood by those projections even after its first quarter ended, and even after it received a July 3, 2012 comment letter from the SEC noting that the company's proxy materials "contain[e]d very specific projections about the future performance of Quality Systems" and urged the company to "provide support for these very specific projected figures by describing the assumptions underlying them, including any limitations on those assumptions or other factors that may cause them not to be realized." The SEC comment letter warned QSI and its directors and management team who signed the proxy materials that "[s]ince the company and its management are in possession of all facts relating to the company's disclosure, they are responsible for the accuracy and adequacy of the disclosures they have made." In a subsequent letter dated July 9, 2012, the SEC commented that QSI had provided

only "generic support and discussion" in support of its projections and that the stated basis for the projections was "confusing."   Nonetheless, QSI, under Razin's direction, issued its definitive proxy statement on July 13, 2012, two weeks after the end of the first quarter, in which it reaffirmed the prior projections.

60.   Razin served as the chairman of the special committee that authored and was responsible for QSI's June 26, 2012 proxy materials and signed the proxy materials on behalf of that committee.   The special committee responsible for the proxy materials was formed by Razin and included only directors who were closely aligned with Razin and chosen by him.   In addition to his formal responsibilities, Razin in fact serves as the *de facto* CEO of the company.   Without board authorization, Razin maintains an office at QSI, controls and directs the use of QSI facilities and resources, and manages the company on a day-to-day basis. All significant decisions regarding the direction of the company are made by Razin, and the company's executive officers do not make public statements regarding the company, its operations, or its financial performance or future prospects without Razin's approval.

61.   At the end of March 2012, QSI's stock price had begun to decline. Between March 30, 2012 and July 2012, QSI's stock price decreased from $43.73 per share to $23.63 per share, a 45.9% decline. That decline in QSI's stock price cannot be explained by overall market performance or the publicly available information regarding the performance of QSI's competitors during that time frame, or by any publicly available information regarding QSI's own financial performance that was disseminated during that period.   QSI's CEO, defendant Plochocki, regularly communicates with the institutional investor community, and some of the institutional investors that previously invested in QSI and with whom Plochocki regularly communicates sold sufficient quantities of QSI stock during that period to cause the price decline.

2883213v1/013471

62.     Razin's management team made the false statements in May, June and July 2012 regarding QSI's fiscal 2013 earnings projections after consulting with Razin and obtaining his approval, as they did on all important matters pertaining to the management of QSI.   Razin and his management team were eager to assure the market that QSI's growth and financial performance would continue and to ensure that Razin would maintain his ability to control QSI's future direction.   The earnings projections in QSI's June 26, 2012 letter to shareholders, reaffirmed in the definitive proxy statement filed on July 13, 2012, were made in the context of a proxy contest, which plaintiff had announced to the QSI board of directors on June 15, 2012. Plaintiff was sponsoring a rival slate of nominees to the QSI board of directors that, if successful, would have substantially curtailed Razin's power over the company.   By reassuring investors regarding QSI's financial performance and growth prospects, Razin and his management team sought to dissuade QSI investors from supporting plaintiff's proposed slate of directors.

63.     Notwithstanding the public statements and communications to plaintiff at QSI board meetings, there in fact was no factual basis whatsoever for the statements that "there is nothing slowing down" as of November 2011, or for the projections of 20%-25% revenue and net income growth for the 2013 fiscal year that were made in May, June and July 2012.   Razin and his management committee had access to real-time information concerning QSI's operating and financial performance, and must have known that those statements—the last of which made *two weeks after the first quarter had ended*—had no factual basis and were false when made.   It is simply impossible that the financial results that the company disclosed on July 26, 2012 beset the company only after the June 26, 2012 statements and were not known to the company at least by July 13, 2012, and it is equally impossible that Razin and his management team did not know there was no factual basis whatsoever for the revenue and earnings projections that were made in May,

COMPLAINT FOR DAMAGES

June and July 2012 and reaffirmed on July 13, 2012 when the prior statements were made.

64.   In fact, as Razin and his management team knew, QSI's financial performance had begun slowing down in late 2011.   Contrary to the growth projections provided to Hussein and the marketplace, QSI's new bookings had, in fact, begun declining a year earlier, in the first quarter of fiscal 2012, and QSI's sales pipeline had begun declining in the fourth quarter of fiscal 2012.

65.   During the earnings call held on July 26, 2012, Plochocki announced that QSI's net income for the first quarter of fiscal 2013 had declined by 18% from the prior year, and that its diluted earnings per share had declined 19% from the prior year. Plochocki said the results were attributable to "lower than expected revenue from large, higher margin software system sales."  On behalf of QSI, Plochocki also retracted the earnings guidance that had been provided in May, June and July 2012, and reaffirmed less than two weeks earlier on July 13, 2012, and stated that QSI was "not affirming our previous guidance nor providing revised guidance at this time." This retraction by the CEO of the company, without any explanation of any change in the company's prospects that could account for the deviation from the earnings guidance that the company had re-affirmed as recently as just thirteen days earlier, *destroyed the credibility of QSI management* and the value of QSI shares in the marketplace, causing a 36.3% price drop in one day and causing the company to trade at a substantial discount to the price to earnings ratios at which its key competitors were trading.

66.   The retraction of QSI's previously issued earnings guidance, without any explanation or the identification of any change in the company's sales or financial performance during the thirteen-day period since it had last re-affirmed its fiscal 2013 earnings guidance, came as a total shock to the market. On July 26, 2012, QSI's stock price immediately plunged from $23.63 per share to $15.04 per share, a

COMPLAINT FOR DAMAGES

2883213v1/013471

one-day 36.3%% drop that wiped out hundreds of millions of dollars in shareholder value.

67.    The disclosure of accurate information concerning QSI's financial performance and growth prospects, coupled with the revelation that the information previously disclosed in May, June and July was false, caused QSI's stock price to drop far more than it would have dropped if QSI management had disclosed accurate information in the first place.  Based on QSI's fundamental business performance, and based on the performance of comparable companies in QSI's industry, QSI's stock likely would have continued trading at far higher prices if QSI management had provided timely and accurate information to the market place.  Due to the destructive effects of defendants' conduct, QSI's stock continues to trade at price to earnings ratios that are substantially lower than those at which peer companies in its industry trade.

68.    Over the years, Hussein had grown increasingly frustrated with Razin's flouting of the corporate governance reforms that had been implemented in 1999, Razin's exercise of complete control over QSI decision making despite his nominal status as an "independent" director, Razin's increasing compensation to QSI directors to facilitate his control over the company, and Razin's providing himself with valuable employee benefits for which he was not qualified, as well as the QSI directors' continual rubber stamping of Razin's decisions and willingness to turn a blind eye to Razin's conduct.  Consequently, Hussein considered selling his QSI shares at various times. For instance, in a November 2011 13D filing, when QSI's stock was trading near its all-time high, Hussein noted that he had considered selling his shares. Later, in late 2011 and early 2012, Hussein discussed the possibility of selling his QSI shares with more than one trading firm. Hussein ultimately decided not to sell his QSI shares based on his consideration of the financial information that was provided to him by QSI management, including particularly the statements by Plochocki and Holt noted above.  Had he known that Plochocki and his management

team, at the behest of Razin, was concealing important information concerning QSI's deteriorating growth prospects, and were making statements regarding QSI's anticipated growth that had no basis in the actual performance of QSI's business, Hussein would have immediately sold his QSI stock while it was trading at a much higher price than it traded at following the July 26, 2012 earnings release.

69.   Following the QSI earnings release on July 26, 2012, Hussein was forced to sell approximately 3.64 million shares of QSI stock between July 26 and July 30, 2012.  Those QSI shares were held in margin accounts with UBS, and served as collateral for a loan issued to Hussein by UBS.  Before selling the stock, UBS did not provide Hussein with an opportunity to satisfy the margin call, which he could have done using other assets, and instead called the entire loan due and liquidated millions of shares of Hussein's stock without any prior notification.   Plaintiff is informed and believes that a representative of UBS, which served as QSI's investment banker, and which Razin once stated to the QSI board of directors managed more than $100 million of Razin's own investments for him, did call James Sullivan, QSI's Executive Vice President and General Counsel, and informed him of UBS's plans to sell Hussein's stock, in violation of Hussein's rights to maintain the privacy of his financial accounts. Sullivan did not inform Hussein of the call, or tell UBS that QSI had no right to involve itself in the sale of Hussein's stock, but rather told UBS that QSI had no objection to UBS proceeding with the sale of Hussein's stock. These forced sales took place while QSI's stock price was at highly depressed levels as a result of the complete retraction of the company's projections in the July 26, 2012 earnings release and conference call, and caused Hussein to lose tens of millions of dollars on the shares that were sold.   Hussein also suffered tens of millions of dollars in market losses on the approximately 5.7 million QSI shares he continued to hold.   QSI directly enabled these forced sales through Sullivan's conversation with UBS, and made no effort to prevent them even though the sale of a

COMPLAINT FOR DAMAGES

2883213v1/013471

substantial portion of Hussein's stock was likely to exacerbate the adverse effects of the retraction of QSI's projections on the company's stock price.

70.    Following the July 26, 2012 QSI earnings release and management's retraction, without explanation, of the company's revenue and earnings projections that had been reaffirmed and disseminated to the investment community less than two weeks earlier, the value of Hussein's QSI investment, which once was worth more than $470 million, had dropped below $140 million.

71.    At the QSI board meeting held on August 16, 2012, the board of directors refused to investigate or even discuss the incredible discrepancy between the projections made and re-affirmed in May, June and July 2012 and the retraction of the company's projections on July 26, 2012.   There were only thirteen days between the July 13, 2012 proxy statement reaffirming the prior 20% to 25% growth projections and the company's disclosure of its actual first quarter results and retraction of its projections on July 26, 2012. At some point during those thirteen days, the company must have concluded that the projections would not be reaffirmed in the July 26, 2012 earnings release and that no further projections would be made. Yet, even despite the magnitude of the one-day 36.3% price drop and destruction of market value that occurred on July 26, 2012, QSI's board of directors declined to fulfill its fiduciary responsibility to conduct any investigation of what led to that conclusion, let alone any investigation of what led the company to make the baseless projections in May, June and July 2012 and then retract those projections just thirteen days after they had last been re-affirmed.

72.    At the August 2012 board meeting, Razin confronted Hussein and told him that he "enjoyed seeing [Hussein's] demise" and "seeing Hussein squirm," and that he wished he had been there to purchase Hussein's shares at a depressed price.

73.    Following the July 26, 2012 QSI earnings release and retraction of the company's projections, Hussein also confronted Plochocki and Holt and asked them how the company could issue projections and then retract them less than two weeks

2883213v1/013471

after they had been reaffirmed. In response, Plochocki said he had authorized the prior projections because they were "even less than what Shelly [Razin] wants." Holt stated that he did not remember signing off on the prior projections.

74.     Under the direction of Razin and his management team, QSI continued to struggle following the July 26, 2012 earnings announcement and sudden retraction of the company's recently reaffirmed projections.  Despite requests from Hussein, the board of directors refused to conduct any investigation of Razin and his management team concerning the earnings statements or take any action to investigate how the company could have made projections that were so fundamentally baseless.

75.     On January 14, 2013, Cline resigned from QSI's board of directors, stating that "[a]fter careful consideration I have decided that given the current board environment and company issues, I am unable to help the company."  In disclosing Cline's resignation, the company did not state the reasons for Cline's resignation or attach Cline's letter to their disclosure, and omitted the fact that Cline's resignation letter had been addressed to the entire board of directors.

76.     QSI's Executive Vice President and General Counsel James Sullivan subsequently resigned from the company in May 2013, shortly after Hussein's resignation from the board of directors, but QSI made no disclosure of the fact of Sullivan's resignation or the reasons for his resignation.

77.     QSI has continued to struggle following the July 26, 2012 earnings announcement and retraction of its revenue and earnings projections. Razin's unchecked exercise of control over the company, which previously caused the departure of the NextGen management team that had engineered the company's prior growth, and which previously destroyed the company's market credibility through the dissemination of false information, has continued to undermine the value of the company and harm plaintiff since the summer of 2012. On May 23, 2013, QSI announced its fourth quarter and full-year earnings for fiscal 2013.  Rather than the 20%-25% revenue growth that the company had projected back in May and June

COMPLAINT FOR DAMAGES

2012, QSI's revenues in fact grew by a meager 7% in fiscal 2013.  QSI's earnings and net income per share declined by 44% from fiscal 2012 to fiscal 2013, in contrast to the 20%-25% growth that the company had previously projected. The company also announced that, as a result of an "operational review," it had recorded a $17.4 million goodwill impairment charge during the fourth quarter of 2013, and that as a result the company had suffered a net loss of $4.1 million in the fourth quarter of fiscal 2013, in contrast to a $15.1 million net profit the prior year. The $17.4 million goodwill impairment, which was enormous in relation to the relatively modest size of the transaction, resulted from an acquisition that Razin completed without any material discussion by the transactions committee, of which Hussein was the chairman at the time of the transaction, in violation of provisions in the corporate by-laws and the 2006 Settlement Agreement requiring transactions of that magnitude to be considered and approved by the transactions committee. Upon information and belief, defendants omitted material information concerning the basis for this impairment in its prior earnings statements and projections.

78.    In contrast to the enormous losses suffered by Hussein, some of the individual defendants profited from the artificially inflated QSI stock price during the spring of 2012.  Plochocki sold 88,500 shares of QSI stock on February 23, 2012 for $43.99 per share, a price near its all-time high. Plochocki was privy to accurate real-time information concerning QSI's sales and financial performance.

79.    Hussein resigned from the QSI board of directors on May 14, 2013.

### CAUSES OF ACTION
### FIRST CAUSE OF ACTION
**(Against All Defendants for Fraud and Deceit)**

80.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 79 inclusive, as set forth above.

81.    Defendants violated the common law of fraud and California Civil Code §§ 1709, 1710 and 1572 through the material misrepresentations and non-disclosures

2883213v1/013471

alleged above, including the false and deceitful representations made in November 2011 that "there is nothing slowing down," and the false representations in May, June and July 2012 that the company expected 20%-25% earnings and revenue growth in the 2013 fiscal year.

82.   Defendants made their material misrepresentations and non-disclosures knowing that their statements were false and misleading and with the intent to defraud plaintiff.  As alleged above, defendants Razin and Plochocki conspired with one another to make the material misrepresentations and non-disclosures, and acted in furtherance of their conspiracy by making false and misleading statements regarding QSI's actual projected financial performance.

83.   Defendants Razin and Plochocki engaged in the wrongful conduct alleged above as officers and directors of QSI and on behalf of QSI, and QSI is thus responsible for their actions.

84.   Hussein reasonably relied on defendants' material misrepresentations and non-disclosures by retaining his QSI stock. Hussein considered selling his QSI stock in late 2011 and early 2012, and discussed doing so with his stockbrokers.  If he had known that the statements made by QSI management regarding the company's projected growth for the 2013 fiscal year were not based on any legitimate factual foundation, Hussein would have sold his QSI stock.  If Hussein had known the true facts concerning QSI's dismal financial performance, he would have disclosed those facts in his own proxy statement because doing so would have provided further support for his effort to replace the incumbent board.

85.   As a proximate result of relying on defendants' material misrepresentations and non-disclosures, plaintiff incurred actual damages consisting of the loss in value of his QSI stock.

86.   Hussein nominated an independent slate of proposed directors that would have stood up to Razin and safeguarded the company and its shareholders. Through their misrepresentations, as well as the disparaging attacks on Hussein's

COMPLAINT FOR DAMAGES

character alleged above, defendants ensured the defeat of Hussein's proposed slate of directors and the election of the slate of directors aligned with Razin. Defendants' conduct caused tremendous and irreparable reputational and financial harm to Hussein, causing him to suffer enormous losses on his QSI stock, harming his reputation in the investment community, leading Hussein's lenders to call outstanding loans, and causing Hussein to lose future investment opportunities.

87.    Defendants' fraudulent conduct alleged above was done intentionally, through malice, fraud and oppression, and with the intention on the part of the defendants to deprive Hussein of the true value of his stock, and was despicable conduct that subjected plaintiff to cruel and unjust hardship in conscious disregard of his rights, so as to justify an award of exemplary and punitive damages.

## SECOND CAUSE OF ACTION
### (By Plaintiffs against all Defendants for Constructive Fraud)

88.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 87 inclusive, as set forth above.

89.    Defendants are liable to plaintiff for constructive fraud under Cal. Civil Code § 1573 in that they breached their fiduciary duties to Hussein as a QSI shareholder and fellow director to protect the interests of plaintiff and to disclose to plaintiff all material facts as to the business and financial prospects of QSI. Defendants failed to comply with their duties and, in the case of defendant Plochocki, instead actually profited from the non-disclosure of material information concerning QSI.

90.    Defendants Razin and Plochocki engaged in the wrongful conduct alleged above as officers and directors of QSI and on behalf of QSI, and QSI is thus responsible for their actions.

91.    As a proximate result of relying on defendants' constructive fraud, plaintiff incurred actual damages consisting in the loss of the value of his QSI stock,

2883213v1/013471

as well as tremendous and irreparable financial and reputational harm, as alleged above.

92.   Defendants' fraudulent conduct alleged above was done intentionally, through malice, fraud and oppression, and was despicable conduct that subjected plaintiff to cruel and unjust hardship in conscious disregard of plaintiff's rights, so as to justify an award of exemplary and punitive damages.

**THIRD CAUSE OF ACTION**
**(Against All Defendants for Negligent Misrepresentation)**

93.   Plaintiff realleges and incorporates by reference paragraphs 1 through 92, as set forth above.

94.   Defendants violated the common law of fraud and California Civil Code §§ 1709 and 1710 through the material misrepresentations and non-disclosures alleged above, including the false representations to plaintiff in November 2011 that "there is nothing slowing down," and the false representations in May, June and July 2012 that the company expected 20%-25% earnings and revenue growth in the 2013 fiscal year.

95.   Defendants knew and intended that plaintiff would rely on their representations regarding QSI's expected earnings and revenue growth, but had no reasonable grounds for believing that their representations were true when they were made.

96.   Hussein reasonably relied on defendants' material misrepresentations and non-disclosures by retaining his QSI stock. Hussein considered selling his QSI stock in late 2011 and early 2012, and discussed doing so with his stockbrokers. If he had known that the statements made by QSI management regarding the company's projected growth for the 2013 fiscal year were not based on any legitimate factual foundation, Hussein would have sold his QSI stock.

COMPLAINT FOR DAMAGES

2883213v1/013471

97.    As   a   proximate   result   of   relying   on   defendants'   material misrepresentations and non-disclosures, Hussein incurred actual damages consisting of the loss in value of his QSI stock.

98.    Defendants Razin and Plochocki engaged in the wrongful conduct alleged above as officers and directors of QSI and on behalf of QSI, and QSI is thus responsible for their actions.

### FOURTH CAUSE OF ACTION
### (Against All Defendants for Breach of Fiduciary Duty)

99.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 98, as set forth above.

100.   As directors or officers of QSI, Razin and Plochocki owed fiduciary duties to plaintiff as a shareholder of QSI.

101.   From late 2011 through July 2012, defendants breached their fiduciary duties of care, loyalty, honesty and good faith by falsely reassuring plaintiff and the market regarding QSI's financial condition and projected future performance, as alleged above, either by directly making false statements about the company and its anticipated future growth, and by omitting material information from the statements that were made, or, in the case of Razin, by authorizing such false statements and omissions to be made by other defendants.

102.   Defendants Razin and Plochocki engaged in the wrongful conduct alleged above as officers and directors of QSI and on behalf of QSI, and QSI is thus responsible for their actions.

103.   As a result of defendants' breaches of fiduciary duty, defendants' credibility with the marketplace was destroyed on July 26, 2012, when QSI retracted the revenue and growth projections it had made in May, June and July 2012 and reaffirmed less than two weeks earlier, on July 13, 2012. Since the July 26, 2012

2883213v1/013471

disclosures, QSI's stock has traded at price/earnings ratios far below those of comparable companies as a result of that loss of credibility.

104. As a result defendants' breaches of fiduciary duty, plaintiff's Quality Systems stock is worth far less than it would have been worth had defendants fulfilled their fiduciary obligations.

105. The breaches of fiduciary duty and acts to assist in the completion of breaches of fiduciary duty by defendants alleged above were done intentionally, through malice, fraud and oppression. This was calculated and despicable conduct that subjected plaintiff to cruel and unjust hardship in conscious disregard of plaintiff's rights, so as to justify an award of exemplary and punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment, jointly and severally, against defendants, as follows:

1. Compensatory damages in an amount to be proven at trial;

2. Punitive and exemplary damages based on defendants' intentional, malicious, cruel and unjust disregard of plaintiffs' rights and interests; and

3. Pre-judgment interest, costs, attorneys' fees and such other legal and equitable relief as the Court deems appropriate.

Dated: October 4, 2013            By: /s/    Stephen E. Morrissey
                                  Stephen E. Morrissey (187865)
                                  E-Mail: smorrissey@susmangodfrey.com
                                  SUSMAN GODFREY L.L.P.
                                  1201 3rd Avenue, Suite 3800
                                  Seattle, WA 98101
                                  Tel: (206) 516-3861
                                  Fax: (206) 516-3883

                                  Steven G. Sklaver (237612)
                                  Oleg Elkhunovich (269238)
                                  E-Mail: ssklaver@susmangodfrey.com
                                  SUSMAN GODFREY L.L.P.
                                  1901 Avenue of the Stars, Suite 950
                                  Los Angeles, CA 90067-1606

2883213v1/013471

Telephone: (310) 789-3100

*Attorneys for Plaintiff Ahmed Hussein*

COMPLAINT FOR DAMAGES

2883213v1/013471

## VERIFICATION

I, Ahmed Hussein, have read the foregoing Verified Complaint know the contents thereof. The matters alleged by me based on my personal knowledge are true and correct, and I believe those matters alleged by me on information and belief are true and correct.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: October 4 2013          By: /s/ _____

Ahmed D. Hussein
Plaintiff

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____David O. Carter_____ and the assigned Magistrate Judge is _____Jean P. Rosenbluth_____ .

The case number on all documents filed with the Court should read as follows:

## 8:14-cv-00110-DOC(JPRx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

_____January 24, 2014_____
Date

By  APEDRO_____
Deputy Clerk

---

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

☐ Western Division
312 N. Spring Street, G-8
Los Angeles, CA 90012

☒ Southern Division
411 West Fourth St., Ste 1053
Santa Ana, CA 92701

☐ Eastern Division
3470 Twelfth Street, Room 134
Riverside, CA 92501

**Failure to file at the proper location will result in your documents being returned to you.**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

Timothy J. Foss, Derivatively on Behalf of Himself and All Others Similarly Situated,

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

Craig A. Barbarosh, George H. Bristol, James C. Malone,  Peter M. Neupert, Morris Panner, D. Russell Pflueger, Steven T. Plochocki, Sheldon Razin, Lance E. Rosenweig and Quality Systems Inc.

**(b) County of Residence of First Listed Plaintiff**  Ogle Co., Illinois
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Orange County, CA
*(IN U.S. PLAINTIFF CASES ONLY)*

**(c) Attorneys** *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

Louis N. Boyarsky (SBN 263379), Glancy Binkow & Goldberg LLP, 1925 Century Park East, Suite 2100, Los Angeles, CA 90067, Telephone: (310) 201-9150

**Attorneys** *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☐ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No    ☐ **MONEY DEMANDED IN COMPLAINT:** $

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause.  Do not cite jurisdictional statutes unless diversity.)

28 U.S.C. §1332(a).  Causes of Action - Breach of Fiduciary Duty, Abuse of Control, Gross Mismanagement, Unjust Enrichment, Insider Selling

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property |  | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** |  | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **TORTS** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | **PERSONAL PROPERTY** | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 370 Other Fraud | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 371 Truth in Lending | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 380 Other Personal Property Damage | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | ☐ 385 Property Damage Product Liability | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | **BANKRUPTCY** | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 422 Appeal 28 USC 158 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | ☐ 423 Withdrawal 28 USC 157 | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | **CIVIL RIGHTS** | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 440 Other Civil Rights | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 441 Voting | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 442 Employment | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 443 Housing/ Accommodations | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 445 American with Disabilities-Employment | ☐ 790 Other Labor Litigation | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 791 Employee Ret. Inc. Security Act | |
| | | | ☐ 448 Education | | |

**FOR OFFICE USE ONLY:**      Case Number:  SACV14-00110

CV-71 (11/13)                          CIVIL COVER SHEET                          Page 1 of 3

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII.  VENUE**:  Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned.  This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A:  Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes  ☒ No | ☐ Los Angeles | Western |
| If "no, " go to Question B.  If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
|  | ☐ Orange | Southern |
|  | ☐ Riverside or San Bernardino | Eastern |

| Question B:  Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
|  | A PLAINTIFF?<br><br>Then check the box below for the county in which the majority of DEFENDANTS reside. | A DEFENDANT?<br><br>Then check the box below for the county in which the majority of PLAINTIFFS reside. |  |
| ☐ Yes  ☒ No | ☐ Los Angeles | ☐ Los Angeles | Western |
| If "no, " go to Question C.  If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
|  | ☐ Orange | ☐ Orange | Southern |
|  | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
|  | ☐ Other | ☐ Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? (Make only one selection per row) | A. Los Angeles County | B. Ventura, Santa Barbara, or San Luis Obispo Counties | C. Orange County | D. Riverside or San Bernardino Counties | E. Outside the Central District of California | F. Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| Indicate the location in which a majority of defendants reside: | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of claims arose: | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ |

| C.1.  Is either of the following true?  If so, check the one that applies: | C.2.  Is either of the following true?  If so, check the one that applies: |
|---|---|
| ☒ 2 or more answers in Column C | ☐ 2 or more answers in Column D |
| ☐ only 1 answer in Column C and no answers in Column D | ☐ only 1 answer in Column D and no answers in Column C |
| Your case will initially be assigned to the SOUTHERN DIVISION. Enter "Southern" in response to Question D, below.  If none applies, answer question C2 to the right.  ➡ | Your case will initially be assigned to the EASTERN DIVISION. Enter "Eastern" in response to Question D, below.  If none applies, go to the box below.  ⬇ |

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above:  ➡ | SOUTHERN DIVISION |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES:** Has this action been previously filed **in this court** and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Have any cases been previously filed in **this court** that are related to the present case?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):** _____   DATE: January 24, 2014

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |