JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| TIMOTHY J. FOSS, derivatively on behalf of QUALITY SYSTEMS INC., <br><br> Plaintiff, <br><br> v. <br><br> CRAIG A. BARBAROSH, GEORGE H. BRISTOL, JAMES C. MALONE, PETER M. NEUPERT, MORRIS PANNER, D. RUSSELL PFLUEGER, STEVEN T. PLOCHOCKI, SHELDON RAZIN, and LANCE E. ROSENZWEIG, <br><br> Defendants, <br><br> and <br><br> QUALITY SYSTEMS, INC., <br><br> Nominal Defendant. | Case No.: SACV 14-00110-CJC(JPRx) <br><br><br> **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH PREJUDICE** |

# I. INTRODUCTION

This is a shareholder derivative action brought on behalf of nominal defendant Quality Systems, Inc. ("QSI") against the current and former executive officers and directors of QSI–Craig A. Barbarosh, George H. Bristol, James C. Malone, Peter M. Neupert, Morris Panner, D. Russell Pfleuger, Steven T. Plochocki, Sheldon Razin, and Lance E. Rosenzweig (together, "Defendants").  The Complaint asserts five causes of action against Defendants for breach of fiduciary duty, abuse of control, and gross mismanagement arising out of QSI allegedly disseminating materially misleading statements about QSI's financial guidance in 2011 and 2012, and various failures of oversight related to those statements.  (Dkt. 1 [Complaint, hereinafter "Compl."] ¶¶ 81–103.)[1]  Before the Court is Defendants and nominal defendant's motion to dismiss Plaintiff's Complaint.  (Dkts. 24 [Notice of Motion], 24-1 [Memorandum of Points and Authorities, hereinafter "Mot."].)  Defendants argue that the Complaint should be dismissed because of Plaintiff's failure to comply with the shareholder demand requirement under Federal Rule of Civil Procedure 23.1 before filing his Complaint.  The Court agrees.  Accordingly, Defendants' motion is GRANTED and Plaintiff's Complaint is DISMISSED WITH PREJUDICE.

# II. BACKGROUND

QSI is a publicly-traded California company that develops and markets practice management and electronic health records ("EHR") software to medical and dental care providers.  (Compl. ¶¶ 2, 13, 39.)  In 2009, Congress passed the American Recovery and Reinvestment Act ("ARRA"), which provided government funds to incentivize healthcare providers to adopt EHR technology.  *See* 42 U.S.C.A. § 1395w-4(o)(1)(A),

---

[1] The Complaint also alleges that Plochocki engaged in insider trading, and that Razin was unjustly enriched.  (Compl. ¶¶ 104–09.)

(E).  As a provider of EHR, QSI "experienced significant growth due primarily to the success of its NextGen business unit," which sold EHR to healthcare providers adopting the technology.  (Compl. ¶ 39.)  Indeed, between 2000 and 2009, NextGen's business grew by 1300%.  (*Id*. ¶ 40.)

Plaintiff alleges that in May 2011, "the market" began to "question whether QSI's historical growth rates could be maintained."  (*Id*. ¶ 41.)  "To reassure the market and maintain the Company's stock price [Defendants] engaged in a scheme of misrepresenting earnings and guidance projections."  (*Id*. ¶ 42.)  Specifically, Plochocki made public statements beginning in May 26, 2011, that QSI was "in agreement with the consensus view of analysts" regarding projections for Fiscal Year 2012 ("FY2012"), and that "worries about flattening and saturation were baseless."  (*Id*. ¶¶ 43–46.)  In 2012, Plochocki continued to make public statements on behalf of QSI representing similar financial guidance regarding QSI's projected future growth and its sales pipeline.  (*Id*. ¶¶ 47–51.)[2]  Plaintiff alleges that Plochocki's statements were "false and misleading because the financial results and guidance contained therein did not comply with GAPP [sic] standards and relevant Securities and Exchange Commission ('SEC') regulations," as QSI "was experiencing a material slow-down."  (*Id*. ¶ 51.)  On May 10, 2012, QSI filed a Press Release and Form 8-K announcing that it had missed its guidance, but issued highly favorable guidance for Fiscal Year 2013 ("FY2013") and projected earnings per share.  (*Id*. ¶ 52.)  A week later on a conference call, Plochocki "misled investors that the poor [FY2012] results were a one-time event," and stated that QSI was "very confident" that it would meet guidance.  (*Id*. ¶¶ 53–54.)

---

[2]  In 2012, Plochocki sold 88,500 of his holdings in QSI stock for $43.99 per share, for proceeds valued at nearly $4 million.  (Compl. ¶ 5.)  Plaintiff alleges that "[i]n using his knowledge of the Company's undisclosed information to sell his personal holdings of Quality Systems common stock at inflated prices, Defendant Plochocki used the Company's proprietary information to his own benefit."  (*Id*. ¶¶ 5, 20.)

On June 26, 2012, QSI filed proxy materials with the SEC that contained an open letter to QSI's shareholders signed by Razin, Barbarosh, Bristol, Rosenzweig, Pflueger, and Plochocki, allegedly motivated by a potential proxy contest by Ahmed Hussein, who was one of QSI's directors at the time. (*Id*. ¶¶ 7, 55.) In that letter, QSI expressed confidence that QSI's "revenues [would] increase in the 20–24% range and its earnings per share [would] grow by 20–25%" for FY2013. (*Id*. ¶ 55.) Plaintiff alleges these statements were false and misleading because "there was no reasonable basis for the guidance issued . . . [as QSI] was already experiencing a material decline." (*Id*. ¶ 56.)

The proxy contest between Hussein and Defendants "drew the attention of the SEC," and on July 3, 2012, the SEC sent a letter to QSI scrutinizing its proxy materials. (*Id*. ¶ 57.) Specifically, the SEC requested that QSI "provide support for [its] very specific projected figures by describing the assumptions underlying them, including any limitations on those assumptions or other factors that may cause them not to be realized." (*Id*. ¶¶ 57–58.) On July 9, 2012, QSI filed a revised preliminary proxy statement to address the SEC's July 3, 2012, letter. (*Id*. ¶ 59.) Thereafter, on July 9, 2012, the SEC sent another letter to QSI, which stated that QSI's revised disclosure was "confusing" because the projections cited in the July 3, 2012, letter did not appear with the assumptions underlying them. (*Id*. ¶¶ 59–60 ["[P]roviding generic support and discussion without the projections themselves is confusing."]) The SEC letter directed QSI to "revise or advise" its response to the SEC's July 3, 2012, criticism. (*Id*. ¶ 60.) QSI then reaffirmed its FY2013 guidance in proxy materials on July 13 and 23, 2012. (*Id*. ¶ 61.) The SEC took no further action regarding QSI after it re-affirmed its FY2013 guidance. (*See generally id*.) Plaintiff alleges that these proxy materials contained statements were false and misleading because "there was no reasonable basis for their positive statements about the Company's purported strong financial conditions and prospects." (*Id*. ¶ 62.)

On July 26, 2012, during a conference call, Plochocki announced that QSI's net income for the first quarter of FY2013 "had declined by 18% from the prior year, and that its diluted earnings per share had declined 19% from the prior year." (*Id.* ¶ 63.) Plochocki also stated that QSI was retracting its earnings guidance from May, June, and July 2012, which had been reaffirmed less than two weeks earlier. (*Id.*) Plochocki said the results were attributable to "lower than expected revenue from large, higher margin software system sales." (*Id.*) That day, QSI's stock price plunged 36.3%, from $23.63 per share to $15.04 per share. (*Id.* ¶¶ 63–64.)[3]

On January 24, 2014, Plaintiff filed this lawsuit. Plaintiff is a current shareholder of QSI and has been a shareholder at "all times relevant to the Individual Defendants' wrongful course of conduct alleged herein." (*Id.* ¶¶ 1, 12, 78.) On February 7, 2014, the parties stipulated to stay the case pending resolution of a motion to dismiss in a related shareholder class action against QSI, Plochocki, Razin, and Paul A. Holt (the "Securities Class Action").[4] (Dkts. 10, 13.) On March 13, 2015, the parties again stipulated to stay the case in light of the Securities Class Action, which was on appeal before the Ninth Circuit. (Dkts. 16, 17). On December 27, 2017, the Court lifted the stay and set a briefing schedule for Defendants' motion to dismiss. (Dkt. 23.)

---

[3] Prior to QSI's issuance of these statements, Plaintiff alleges that Razin engaged in self-dealing based on allegations from a separate lawsuit against Razin filed by Hussein on October 4, 2013. (Compl. ¶¶ 72–73, Ex. A.) Razin was formerly the CEO of QSI, but was terminated from that position by the Board in March 2000. (*Id.* ¶ 21.) Hussein alleged that "in May 2010, Joseph Davis, an independent director of the Company alerted the Company's Board that Defendant Razin had for the prior seven years falsely certified that he was a full-time employee of the Company in order to obtain health insurance for himself and his wife under the Company's benefit plan." (*Id.* ¶ 72.) Davis proposed an independent investigation of the issue, which Hussein seconded, but it "was voted down by Defendant Razin and the directors aligned with him." (*Id.*) Hussein also alleged that "Razin had the Board approve a resolution under which he and his wife would receive life insurance benefits," which was drafted without prior authorization from the Board and "contravenes the Company's 2000 severance agreement with him under which he was only to receive insurance for three years following his termination." (*Id.* ¶ 73.)

[4] The Securities Class Action is styled *Deerfield Beach Police Pension Fund v. Quality Systems, Inc., et al*, Case No. 13-cv-01818-CJC-JPR.

Plaintiff asserts five "counts" against Defendants: (1) breach of fiduciary duty for disseminating false and misleading information, (*id.* ¶¶ 81–84), (2) breach of fiduciary duty for failing to maintain internal controls, (*id.* ¶¶ 85–88), (3) breach of fiduciary duty for failing to properly oversee and manage the company, (*id.* ¶¶ 89–94), (4) abuse of control, (*id.* ¶¶ 95–99), and (5) gross mismanagement, (*id.* ¶¶ 100–03).[5]

Plaintiff did not make a pre-suit demand on QSI's nine member board before filing this action, (*id.* ¶ 80), nor did he make a books-and-records inspection request, (Mot. at 6). At the time of filing this action, QSI's Board consisted of Barbarosh, Bristol, Malone, Neupert, Panner, Pflueger, Plochocki, Razin, and Rosenzweig. (Compl. ¶¶ 14–22, 79.)[6] Plaintiff asserts that demand is futile because each member of the Board faces a substantial likelihood of liability for breaching their fiduciary duties of loyalty and good faith as alleged in the Complaint. (*Id.* ¶ 80(f).). Plaintiff alleges that "because of their positions of control and authority as directors and/or officers of Quality Systems, [Defendants] were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company." (*Id.* ¶ 25.) Plaintiff also alleges that each Defendant, as a Board member, "was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein." (*Id.* ¶ 37.) According to Plaintiff, Plochocki, Barbarosh, Bristol, Pflueger, Rosenzweig, and Razin sit on the Special Committee that was responsible for the Company's proxy materials and all signed the June 26, 2012 letter containing misleading guidance. (*Id.* ¶ 80(b), (c).) Plaintiff also alleges that Plochocki issued the false statements alleged in the Complaint, (*id.* ¶ 80(d)), and that Bristol and Pflueger sit on QSI's Audit Committee, (*id.* ¶ 80(e)).

---

[5] Plaintiff also asserts a count for unjust enrichment against Razin, (Compl. ¶¶ 104–06), and a count for insider trading against Plochocki, (*id.* ¶¶ 107–09).

[6] QSI's current Board consists of Barbarosh, Bristol, Malone, Panner, Razin, Rosenzweig, Rusty Frantz, Julie Klapstein, and Jeffrey Margolis. (Dkt. 24-10.)

## III. DISCUSSION

"A shareholder seeking to vindicate the interests of a corporation through a derivative suit must first demand action from the corporation's directors or plead with particularity the reasons why such demand would have been futile." *Rosenbloom v. Pyott*, 765 F.3d 1137, 1148 (9th Cir. 2014) (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 989 (9th Cir. 1999) (as amended)).  Such requirement follows from "the general rule of American law . . . that the board of directors controls a corporation." *Potter v. Hughes*, 546 F.3d 1051, 1058 (9th Cir. 2008).  "The board's control includes and ought to include the decision whether to pursue litigation when the corporation may have suffered harm." *La. Mun. Police Emps.' Ret. Sys. v. Wynn*, 829 F.3d 1048, 1057 (9th Cir. 2016).  Hence, "[a]bsent sufficient reason to doubt the directors' ability to make disinterested and independent decisions about litigation, the board is not only empowered but optimally positioned to make decisions on behalf of the corporation and, if appropriate, pursue litigation." *La. Mun. Police Emps.' Ret. Sys. v. Pyott*, 46 A.3d 313, 339 (Del. Ch. 2012), *rev'd sub nom. on other grounds Pyott v. La. Mun. Police Emps.' Ret. Sys.*, 74 A.3d 612 (Del. 2013).  In the context of demand futility, "directors are entitled to a *presumption* that they were faithful to their fiduciary duties," and "the burden is upon the plaintiff in a derivative action to overcome that presumption." *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048–49 (Del. 2004) (emphasis in original).

The parties do not dispute that Plaintiff did not make the required demand upon the Board before bringing his derivative claims, but only dispute whether Plaintiff has pled particularized allegations demonstrating that demand is futile.  Federal Rule of Civil Procedure 23.1 requires a plaintiff to "state with particularity . . . the reasons for not obtaining [the desired action from the directors or comparable authority] or not making the effort."  Fed. R. Civ. P. 23.1 (b)(3).  Additionally, "[t]he substantive law which

determines whether demand is, in fact, futile is provided by the state of incorporation of the entity on whose behalf the plaintiff is seeking relief." *Rosenbloom*, 765 F.3d at 1148 (quoting *Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 138 (2d Cir. 2004)). QSI is a California corporation. California courts look to Delaware law to determine the adequacy of the pleading of demand futility. *Apple Inc. v. Superior Court*, 18 Cal. App. 5th 222, 233 (Ct. App. 2017) (citing *Bader v. Anderson*, 179 Cal. App. 4th 775, 797 (Ct. App. 2009)).

To adequately allege demand futility under Delaware law, Plaintiff must establish that a majority of the Board at the time the Complaint was filed (1) is "interested," meaning that the Board member faces "a substantial likelihood of liability" with respect to each claim, *Aronson v. Lewis*, 473 A.2 805, 815 (Del. 1984), or (2) lacks "independence," meaning that the Board member "is 'beholden' to an *interested* director or officer, or so under their influence that their discretion would be sterilized," *Bader*, 179 Cal. App. 4th at 792 (citations omitted).[7]  "But where there is no director who is interested in the transaction, there is no need to consider the independence of the remaining directors." *In re Dow Chem. Co. Derivative Litig. ("Dow Chem.")*, No. CIV.A. 4349-CC, 2010 WL 66769, at *7 (Del. Ch. Jan. 11, 2010) (citing *Brehm v. Eisner*, 746 A.2d 244, 258 (Del. 2000) (because the plaintiff failed to create a reasonable doubt that the director was disinterested, the court "need not reach or comment . . . on the independence of the other directors")); *see also In re Google, Inc. S'holder Derivative*

---

[7] Under Delaware law, courts apply the *Aronson* test for claims challenging a specific board action or decision, and the *Rales* test in all other circumstances. *Bader*, 179 Cal. App. 4th at 791; *see Aronson*, 473 A.2 at 814; *Rales v. Blasband*, 634 A.2d 927, 933–34 (Del. 1993). The distinction between the two tests is "largely academic." *Leyte-Vidal v. Semel*, 220 Cal. App. 4th 1001, 1010 (2013). Under either test, the shareholder plaintiff must allege with particularity that a majority of board members were not independent or disinterested. *Oswald v. Humphreys*, No. C16-00241 CRB, 2016 WL 6582025, at *1 (N.D. Cal. Nov. 7, 2016) (citing *Beam*, 845 A.2d at 1046); *see Rosenbloom*, 765 F.3d at 1150 (the distinction between *Aronson* and *Rales* "does not matter" in cases in which the plaintiff alleges a violation of the duty of loyalty; "Under either approach, demand is excused if Plaintiffs' particularized allegations create a reasonable doubt as to whether a majority of the board of directors faces a substantial likelihood of personal liability for breaching the duty of loyalty.").

*Litig.*, No. C 11-4248 PJH, 2013 WL 5402220, at *4 (N.D. Cal. Sept. 26, 2013). If all directors lack a personal or adverse interest in the claim, the beholdenness of any director to another director "is irrelevant because there is no fear that [any] director . . . will do anything contrary to the best interest of the company and its stockholders." *Dow Chem.*, 2010 WL 66769, at *8.

To demonstrate that a director is interested, the plaintiff must demonstrate that the director faces "a substantial likelihood of director liability" for the alleged actions. *Aronson*, 473 A.2d at 815. "A 'mere threat of personal liability for approving a questioned transaction' by itself is insufficient to refute the disinterestedness or independence of a director." *Bader*, 179 Cal. App. 4th at 792 (quoting *Aronson*, 473 A.2d at 815.) A company's choice to limit director liability affects whether a director faces a substantial likelihood of liability. Under QSI's articles of incorporation, authorized by Section 204(a)(10) of California Corporations Code, QSI limits Board member liability "to the fullest extent permissible under California law." (Dkts. 24-3, 24-4.)[8] Under Section 204(a)(10), a corporation may not discharge a director from liability

---

[8] Defendants' request for judicial notice, (Dkt. 25), is GRANTED as to Exhibit 1, QSI's Restated Articles of Incorporation, filed with the SEC on January 11, 1996, and Exhibit 2, QSI's Amended and Restated Bylaws, filed with the SEC on October 30, 2008. Rule 201(b) of the Federal Rules of Evidence authorizes courts to take judicial notice of facts that are "not subject to reasonable dispute" and that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). As an initial matter, Plaintiff does not dispute the accuracy of these exhibits. The Court may take judicial notice of these exhibits as publicly available documents filed with the SEC. *See Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (Courts may consider "any matter subject to judicial notice, such as SEC filings," when considering a 12(b)(6) motion). "[A] district court may take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC as facts capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *In re Silicon Graphics*, 970 F. Supp. at 758 (citation omitted). Additionally, courts routinely consider a company's certificate of incorporation and bylaws in assessing a motion to dismiss a derivative suit. *See, e.g., In re Polycom, Inc.*, 78 F. Supp. 3d 1006, 1014 n.3, n.4 (N.D. Cal. 2015); *Brown v. Moll*, No. C 09–05881 SI, 2010 WL 2898324, at *1 n.1, *4 (N.D. Cal. July 21, 2010); *see also Grant v. Aurora Loan Servs., Inc.*, 736 F. Supp. 2d 1257, 1265 (C.D. Cal. 2010) (taking judicial notice of articles of incorporation). Finally, "[f]acts of independent legal significance constituting a contract which is at issue are not hearsay." *United States v. Rubier*, 651 F.2d 628, 630 (9th Cir. 1981) (per curiam). A document "which . . . itself affects the legal rights of the parties" is not introduced for the truth of the matter asserted because "the significance of [the] offered

for, among others, intentional misconduct, knowing violations of law, bad-faith actions, or receipt of improper personal benefits. Accordingly, Plaintiff must plead a nonexculpated claim against each Board member based on particularized facts that show bad faith or some other misconduct on the part of the Board member. *Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003); *see also Gordon v. Bindra*, No. 2:14-CV-01058-ODW, 2014 WL 2533798, at *5 (C.D. Cal. June 5, 2014) (the plaintiff must plead a "nonexculpated claim against the directors based on particularized facts" in light of an exculpatory provision).

When Plaintiff filed the Complaint, QSI's Board consisted of Barbarosh, Bristol, Malone, Neupert, Panner, Pflueger, Plochocki, Razin, and Rosenzweig. (Compl. ¶¶ 14–22, 79.) Three Board members, Malone, Neupert, and Panner, joined after the alleged misconduct occurred, (*id.* ¶¶ 16–18), and thus cannot face potential liability for Plaintiff's claims. *See In re Am. Int'l Grp., Inc. Derivative Litig.*, 700 F. Supp. 2d 419, 440 (S.D.N.Y. 2010), *aff'd*, 415 F. App'x 285 (2d Cir. 2011). To demonstrate that demand upon QSI's Board at the time of filing his Complaint would have been futile, Plaintiff must allege with particularity that at least five of the six remaining Board members face a substantial likelihood of harm for bad faith or other wrongful conduct. *See Beam*, 845 A.2d at 1046. Plaintiff brings two types of claims against Defendants: (1) disclosure claims, for the allegedly false and misleading statements about QSI's financial guidance–Counts One and Four, (Compl. ¶¶ 83, 96), and (2) failed "oversight" claims–Counts Two, Three, and Five, (*id.* ¶¶ 85–94, 100–03).[9] The Court will address each in turn.[10]

---

statement lies solely in the fact that it was made." Fed. R. Evid. 801(c) advisory committee's note. Because QSI's Articles of Incorporation and Bylaws are corporate documents that affect the legal rights of Defendants and the exculpatory provisions are significant only in the fact they were made, the fact that QSI limits its Board member's liability "to the fullest extent permissible under California law" may be considered for the purpose of adjudicating issues raised by Defendants' motion.

[9] Plaintiff does not contest Defendants' grouping of his claims in his Opposition. (*See generally* Opp.)

[10] Plaintiff's unjust enrichment and insider trading causes of action each address only one director, Razin and Plochocki, respectively. Indeed, Plaintiff concedes that he does not allege that any Board member, besides Razin and Plochocki, faces a substantial likelihood of liability for his unjust

Plaintiff has failed to plead particularized allegations that suggest sufficient Board involvement in the preparation of QSI's financial guidance to support a substantial likelihood of liability against any Defendant on Plaintiff's disclosure claims.  Plaintiff alleges that six directors–Barbarosh, Bristol, Rosenzweig, Pflueger, Razin, and Plochocki–"caus[ed] or allow[ed] the Company to disseminate materially misleading and inaccurate information." (Compl. ¶¶ 83, 96.) However, "[p]leading that the director defendants 'caused' or 'caused or allowed' the Company to issue certain statements is not sufficient particularized pleading to excuse demand under Rule 23.1." *In re Citigroup Inc. S'holder Derivative Litig. ("Citigroup")*, 964 A.2d 106, 130 n.88, 134 (Del. Ch. 2009); *see Bader*, 179 Cal. App. 4th at 792 ("A plaintiff may not bootstrap allegations of futility by pleading merely that the directors participated in the challenged transaction or that they would be reluctant to sue themselves.") (internal quotations and citation omitted).  And Plaintiff does not plead with particularity facts that any Board member was sufficiently involved in drafting or preparing the alleged misstatements, or knew that the statements were false or misleading.[11]  Such conclusory allegations do not demonstrate that any Board member "was actually involved in creating or approving the

---

enrichment and insider trading claims.  (*See* Opp. at 18 n.8.)  As such, Plaintiff has not pled that a majority of the Board were not independent or disinterested with respect to those two claims, and demand was not excused.  *See, e.g., In re Paypal Holdings, Inc. S'holder Derivative Litig.*, No. 17-CV-00162-RS, 2018 WL 466527, at *6 (N.D. Cal. Jan. 18, 2018) (holding that demand was not excused based on the plaintiffs' insider trading claim where their allegations concerned only one director on the board); *Baca ex rel. Nominal Defendant Insight Enterprises, Inc. v. Crown*, No. CV 09-1283-PHX-SRB, 2010 WL 2812697, at *10 (D. Ariz. Jan. 8, 2010), *aff'd sub nom. Baca v. Crown*, 458 F. App'x 694 (9th Cir. 2011) (demand was not excused because the plaintiff alleged only four of the nine board members were interested or faced substantial likelihood of liability).

[11]  In his Opposition, Plaintiff characterizes his allegations as demonstrating that "the Board actively participated in and were directly aware of a pervasive scheme to manipulate the reporting of the Company's financial condition and future prospects." (Opp. at 2.)  But Plaintiff's conclusory allegations, (Compl. ¶¶ 5, 55), do not establish with particularity the Board's active participation or actual awareness of the alleged misconduct.  *See, e.g., In re Silicon Graphics*, 183 F.3d at 990 (A "general allegation that the Board participated in the fraudulent scheme" is "insufficient to demonstrate that the Board engaged in conduct that resulted in a substantial risk of personal liability."); *Durgin v. Sharer*, No. CV073001PSGPLAX, 2017 WL 2214618, at *8 (C.D. Cal. Jan. 10, 2017) ("[C]onclusory allegations that the director Defendants participated in, approved, or permitted the alleged wrongdoing" are insufficient to excuse demand.).

statements, factual details that are crucial to determining whether demand on the board of directors would have been excused as futile," *Citigroup*, 964 A.2d at 130 n.88, and without such particularized allegations, "the Court cannot infer that the board acted in bad faith, knowingly, or with intent to deceive," *In re Polycom, Inc.*, 78 F. Supp. 3d 1006, 1017 (N.D. Cal. 2015).[12]

Plaintiff nevertheless argues that Razin, Barbarosh, Bristol, Rosenzweig, Pflueger, and Plochocki served on the Special Committee "that was responsible for the Company's Proxy Materials," and thus face a substantial likelihood of liability on Plaintiff's disclosure claims. (Compl. ¶¶ 55, 80(b)–(c).) As an initial matter, Barbarosh, Rosenzweig, and Plochocki did not serve on the Special Committee. (*See* Dkt. 24-7.)[13] And Plaintiff's general allegations that a director served on a committee do not establish that any Board member had a culpable state of mind, or had an actual role in the alleged misstatements. *See Wood v. Baum*, 953 A.2d 136, 142 (Del. 2008) (directors' service on an audit committee did not support inference that they had a culpable state of mind). Plaintiff's Complaint lacks "factual allegations to show that these defendants should have

---

[12] The Court notes that although Plaintiff has pled that Plochocki made many of the allegedly false and misleading statements, (Comp. ¶¶ 44–50, 53–55), Plaintiff does not plead particularized facts demonstrating that Plochocki knew the statements were false or misleading. That Plochocki was "privy to internal documents," (Opp. at 19), does not establish what information Plochocki knew, how that information contradicted QSI's guidance, or that Plochocki was aware of these contradictions. *See, e.g.*, *Rattner v. Bidzos*, No. Civ.A 19700, 2003 WL 22284323, at *10 n. 53 (Del.Ch. Sept. 30, 2003) (allegations that directors "must have known" about and "failed to prevent and correct the improper financials" are insufficient); *Ferre v. McGrath,* 2007 WL 1180650, at *6 (S.D.N.Y. 2007) (holding that "[a]llegations of knowledge explained solely by the directors' service as directors, without more, are insufficient as a matter of law—even where, as here, the plaintiff alleges that the matters in suit relate to the corporation's 'core' business").

[13] Defendants' request for judicial notice, (Dkt. 25), is GRANTED as to Exhibit 5, QSI's Definitive Proxy Statement on Schedule 14A, filed with the SEC on July 13, 2012. Plaintiff does not dispute the authenticity of this exhibit, or that this exhibit is referenced in the Complaint. The Court may consider this exhibit because a court may consider any document "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiffs' pleading." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (quoting *In re Silicon Graphics*, 183 F.3d at 986)); *see also In re Yahoo! Inc. S'holder Derivative Litig.*, 153 F. Supp. 3d 1107, 1117 (N.D. Cal. 2015). Additionally, the court may take judicial notice of these exhibits as publicly available documents filed with the SEC under Federal Rule of Evidence 201(b)(1). *See, e.g., Dreiling*, 458 F.3d at 946 n.2.

suspected misconduct in the reporting of sales or preparation of statements," and "that they had the necessary information to realize that there were misstatements." *In re Maxwell Techs., Inc. Derivative Litig.*, No. 13-CV-966-BEN RBB, 2014 WL 2212155, at *14 (S.D. Cal. May 27, 2014) (the plaintiff did not plead particularized facts to demonstrate that any director faced a substantial likelihood of liability based on audit committee service).[14]

Plaintiff also argues that the fact that Razin, Barbarosh, Bristol, Rosenzweig, Pflueger, and Plochocki signed the June 26, 2012, letter "containing [allegedly] misleading guidance" demonstrates they face a substantial likelihood of liability on these two claims. (Compl. ¶¶ 55, 80(c).) But conclusory allegations that a Board member signed the letter are insufficient to demonstrate active participation in the alleged misconduct, and are insufficient to demonstrate that the directors had actual or constructive notice of any illegality. *In re Yahoo! Inc. S'holder Derivative Litig.*, 153 F. Supp. 3d 1107, 1120 (N.D. Cal. 2015) (conclusory allegations that directors "'signed' or were involved in 'reviewing' the disclosures at issue" did not excuse demand under Delaware law); *Citigroup*, 964 A.2d at 133 n.88, 134 (ruling that conclusory allegations that the board "reviewed" statements did not show they were "directly responsible for the misstatements or omissions" as required).[15]

---

[14] Plaintiff argues that Audit Committee members were mandated to perform a "heightened review" of QSI's financial guidance, so they face a substantial likelihood of liability for permitting QSI to disseminate the allegedly false or misleading statements. (Opp. at 20–21.) Assuming *arguendo* that the Audit Committee's charter set forth its role regarding the statements at issue, "director liability is not measured by the aspirational standard established by the internal documents detailing a company's oversight system." *Citigroup*, 964 A.2d at 135. Plaintiff must plead with particularity "'the precise roles that these directors played at the company, the information that would have come to their attention in these roles, and any indication as to why they would have perceived the [wrongdoing].'" *In re Computer Scis. Corp. Derivative Litig.*, 244 F.R.D. 580, 590 (C.D. Cal. 2007), *aff'd sub nom. Laborers Int'l Union of N. Am. v. Bailey*, 310 F. App'x 128 (9th Cir. 2009) (quoting *Guttman*, 823 A.2d at 503). Plaintiff has failed to do so.

[15] Plaintiff argues that Defendants also face a substantial likelihood of liability for approving life insurance for Razin and his wife, and for declining to investigate his receipt of health insurance benefits after he was no longer employed by QSI. (Opp. at 14–17; *see* Compl. ¶¶ 72–73.) Plaintiff has not

1    Plaintiff also has failed to plead particularized allegations that suggest a substantial likelihood of liability against any Defendant for his oversight claims.  Plaintiff's oversight claims, based on the Board's alleged failure to prevent harm to QSI, are commonly referred to as *Caremark* claims.  *See In re Yahoo!*, 153 F. Supp. 3d at 1121; *see also In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996).  This type of "failure of oversight" theory is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."  *Caremark*, 698 A.2d at 967.  To establish a substantial likelihood of liability for a *Caremark* claim, Plaintiff must plead particularized facts to show that "(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations, thus disabling themselves from being informed of risks or problems requiring their attention." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006).  "Where, as here, directors are exculpated from liability except for claims based on 'fraudulent,' 'illegal' or 'bad faith' conduct, a plaintiff must also plead particularized facts that demonstrate that the directors acted with scienter, i.e., that they had 'actual or constructive knowledge' that their conduct was legally improper." *Wood*, 953 A.2d at 141 (quoting *Guttman*, 823 A.2d at 501).

Because Plaintiff concedes that QSI had reporting systems and controls in place, (*see generally* Opp.; Compl. ¶¶ 30, 32–33), the Court's inquiry focuses on whether QSI's Board members deliberately failed to monitor their internal controls.  *See Stone*, 911 A.2d

---

alleged particularized facts regarding these Board actions.  Plaintiff does not allege which Board members voted against the investigation or approved Razin's life insurance, or what information was before the Board when it reached these decision.  These conclusory allegations do not meet the heightened pleading requirements of Rule 23.1.  *See City of Roseville Employees' Ret. Sys. v. Crain*, No. CIV.A. 11-2919 JLL, 2011 WL 5042061, at *5 (D.N.J. Oct. 24, 2011) (the plaintiff failed to plead particularized facts that "single[d] out, among current and past directors, which directors participated in the alleged wrongdoing" or that the directors had "actual knowledge regarding the alleged wrongdoing, making conscious decisions not to monitor or oversee misconduct" as required to establish a failure to act claim) (quoting *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006)).

at 370; *In re Polycom, Inc.*, 78 F. Supp. 3d at 1015.  Thus, to excuse demand, Plaintiff must plead "with particularity that there were so-called 'red flags' that put the directors on notice of problems with their systems, but which were consciously disregarded." *In re Yahoo!*, 153 F. Supp. 3d at 1121.  "[E]vidence of illegality" is the "proverbial 'red flag.'" *South v. Baker*, 62 A.3d 1, 15 (Del. Ch. 2012); *see Rosenbloom*, 765 F.3d at 1151 ("If a majority of the Board had actual or constructive knowledge of violations of law at [the company], and did nothing, it violated its duty of loyalty and faces a substantial likelihood of liability.").[16]

Plaintiff has not alleged any "red flags" that put the Board on notice of the alleged problems at QSI.  Plaintiff argues that the two SEC comment letters sent to QSI in 2012 put the Board on notice of serious misconduct and illegality.[17]  (Dkt. 26 [Plaintiff's Opposition, hereinafter "Opp."] at 22–24.)  But Plaintiff fails to allege that any Board member received either letter, or plead any facts that support the inference that the SEC

---

[16] While Plaintiff cites several cases in which the court found that the directors failed to properly oversee the company at issue, (Opp. at 14–15, 21–23), Plaintiff's conclusory allegations fall far short of the egregious facts in those cases.  *See, e.g., In re Brocade Commc'ns Sys., Inc. Derivative Litig.*, 615 F. Supp. 2d 1018, 1031–33, 1048 (N.D. Cal. 2009) (holding the plaintiff had adequately alleged "systemic deficiencies in the options-granting process" that demonstrated "willful ignorance," including that the defendants "actively manipulated the timing and exercise of stock-option grants," and "falsified the dates of stock-option grants, forged records relating to Board proceedings, and created sham programs to lower the exercise prices of stock-option grants or to change the vesting periods"); *In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 277–78 (S.D.N.Y. 2006) (demand excused based on allegations that "the Audit Committee abdicated its responsibility to monitor legal compliance and investigate whistleblower claims relating to the Company's allegedly flagrant, systematic and repeated violations of export control laws").

[17] Plaintiff also argues that Hussein put the Board on notice of the alleged illegalities through his proxy battle and criticism of QSI's financial guidance. (Opp. at 23; Compl. ¶¶ 7, 57–60.)  Hussein's actions do constitute "red flags."  First, Plaintiff merely alleges that Hussein's proxy battle "drew the attention of the SEC," and does not allege that the proxy battle itself provided the Board with any "red flags." (Compl. ¶ 57.)  Second, Hussein criticized QSI's financial guidance after it was issued, meaning this allege "red flag" was too late to serve as a warning to the Board regarding the issuance of that guidance.  And Plaintiff does not allege that QSI made any false or misleading statements after Hussein's accusations.

letters came to the attention of the Board members.[18] *See In re Am. Apparel, Inc. S'holder Derivative Litig.*, No. CV 10-06576 MMM RCX, 2012 WL 9506072, at *26 (C.D. Cal. July 31, 2012) ("Missing are allegations that defendants had actual or constructive knowledge of the deficiencies, knew that they created a high likelihood that the company was violating immigration laws, and nonetheless failed to rectify them."); *Guttman*, 823 A.2d at 503. Nor does Plaintiff explain how the letters could have alerted the Board to systemic deficiencies in QSI's internal controls. The SEC letters do not claim that QSI violated the law or engaged in serious misconduct, but simply requested that QSI clarify certain financial guidance. At no time did the SEC state that QSI was committing illegal acts, or even characterize QSI's actions as illegal. *Compare In re Impax Labs., Inc. S'holder Derivative Litig.*, No. 14-CV-04266-HSG, 2015 WL 5168777, at *5 (N.D. Cal. Sept. 3, 2015) (FDA Form 483s that informed the company of "conditions that *may* constitute violations of the law or of [certain FDA] regulations" did not impose a known duty on the director defendants to take responsive action) *with McCall v. Scott*, 239 F.3d 808, 819–20 (6th Cir.), *amended on denial of reh'g*, 250 F.3d 997 (6th Cir. 2001) (plaintiff alleged "reckless disregard" of red flags including audit information, ongoing acquisition practices, allegations brought in a *qui tam* action, an extensive federal investigation, a *New York Times'* investigation, and inaction by the Board). The SEC letters do not constitute "red flags."[19]

---

[18] Plaintiff also alleges that these six Board members "ratified" the alleged misconduct, but provides no particular allegations about the supposed ratification. (Compl. ¶ 28.) Conclusory allegations that directors "ratified" misconduct are insufficiently particularized to demonstrate that a director faces a substantial likelihood of liability. *See In re CNET Networks, Inc.*, 483 F. Supp. 2d 947, 964 (N.D. Cal. 2007) (plaintiff did not allege with particularity what "ratified" actually means, leaving the court to guess at the director's involvement in the alleged misconduct).

[19] Plaintiff also alleges that Bristol and Pflueger are "interested" or "conflicted" regarding the oversight claims due to their service on QSI's Audit Committee. (Compl. ¶ 80(e).) However, committee service alone does not establish that either Defendant consciously disregarded their fiduciary duties or acted in bad faith. *See Wood*, 953 A.2d at 142. "It is 'contrary to well-settled Delaware law' to 'infer that the directors had a culpable state of mind based on allegations that certain board members serve on an audit committee, and as a consequence, should have been aware of the facts on which the plaintiff premised' claims of wrongdoing." *In re Yahoo!*, 153 F. Supp. 3d at 1122 (citations omitted).

Nor does Plaintiff plead particularized facts that suggest the Board consciously ignored these alleged "red flags" in bad faith. Plaintiff concedes that after receiving the SEC's July 3, 2012 letter, QSI filed a revised preliminary proxy statement. (Compl. ¶¶ 59–61.) And when QSI reaffirmed its FY2013 guidance after receiving the SEC's July 9, 2012, letter, the SEC took no further action. (*Id*.) Plaintiff's allegations suggest that the Board responded appropriately, and that no further response was required at that time. That Plaintiff characterizes the Board's response as a "wrong" decision in response to alleged red flags is insufficient to plead bad faith or intentional misconduct. *See Citigroup*, 964 A.2d at 131 ("Instead of alleging facts that could demonstrate bad faith on the part of the directors, by presenting the Court with the so called 'red flags,' plaintiffs are inviting the Court to engage in the exact kind of judicial second guessing that is proscribed by the business judgment rule. In any business decision that turns out poorly there will likely be signs that one could point to and argue are evidence that the decision was wrong.").[20]

Now that the Court has determined that Plaintiff's Complaint fails to plead particularized facts demonstrating that demand on QSI's Board would have been futile, it must decide whether to grant Plaintiff leave to amend the Complaint to cure that deficiency. In most instances, leave to amend must be freely granted, Fed. R. Civ. P. 15(a), and that policy is "to be applied with extreme liberality," *Eminence Capital, LLC*

---

[20] Plaintiff also alleges that after QSI retracted its guidance, the Board refused to investigate the discrepancy between QSI's prior projections and its retracted guidance. (Compl. ¶ 7.) While Plaintiff argues this suggests bad faith, Plaintiff has not alleged particularized facts regarding why the Board refused to investigate, or how this decision is unworthy of deference in light of the "presumption that [directors] can and should be allowed to manage the business affairs of a corporation, including the decision of whether and how to investigate errors like these and whether ultimately to bring claims on the corporation's behalf." *In re Computer Scis. Corp.*, 244 F.R.D. at 591 (citing *Spiegel v. Buntrock*, 571 A.2d 767, 772–73 (Del. 1990)). "In fact, having failed to seek access to [QSI's] books and records before filing suit, [Plaintiff] has no idea what the investigation actually entailed and is unable to plead any facts about what the [QSI] board did, when they did it, what they discussed, what conclusions they reached, and why the board did or did not do anything." *Desimone v. Barrows*, 924 A.2d 908, 951 (Del. Ch. 2007) (conclusory allegations that the company's board failed to adequately investigate claims did not establish that demand was futile).

*v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003). However, leave to amend is not warranted if the Complaint cannot be saved by amendment. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Arizona Students' Ass'n v. Arizona Bd. of Regents*, 824 F.3d 858, 871 (9th Cir. 2016) ("Dismissal of a complaint without leave to amend is only proper when, upon de novo review, it is clear that the complaint could not be saved by any amendment."). That is the case here.

If Plaintiff were permitted to amend, he would be required to establish that demand was futile as to QSI's *current* Board. *See In re Yahoo!*, 153 F. Supp. 3d at 1128 ("Any further amended complaint would have to plead demand futility against [the company's] current board of directors.") (citing *Braddock v. Zimmerman*, 906 A.2d 776 (Del. 2006)). The majority of QSI's current Board– Rusty Frantz, Julie Klapstein, Jeffrey Margolis, Malone, and Panner–joined *after* the alleged misconduct took place. (Dkts. 24-9, 24-10.)[21] They have no liability on Plaintiff's claims and are disinterested. *See In re Yahoo!*, 153 F. Supp. 3d at 1128 n.14 (dismissing a derivative action without leave to amend because "demand plainly could not be excused given that, with the exception of [one director], all of Yahoo's current directors joined the board after the events at issue in this litigation"); *In re Silicon Graphics*, 183 F.3d at 991 (affirming dismissal of derivative

---

[21] Defendants' request for judicial notice pursuant to Fed. R. Evid. 201, (Dkt. 25), is GRANTED as to Exhibit 7, QSI's Definitive Proxy Statement on Schedule 14A, filed with the SEC on July 13, 2017, and Exhibit 8, QSI's corporate web page retrieved on February 1, 2018. As an initial matter, Plaintiff does not dispute that these exhibits accurately state the current composition of QSI's Board. Nor does Plaintiff dispute that the composition of QSI's current Board is a matter of public record that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. The Court may take judicial notice of Exhibit 7 as a publicly available document filed with the SEC. *See, e.g., Dreiling*, 458 F.3d at 946 n.2. And the Court may take judicial notice of Exhibit 8 as "a more recently published version of the same information contained in [Exhibit 7], which [has been judicially noticed], and because it is not subject to reasonable dispute." *In re Yahoo!*, 153 F. Supp. 3d at 1118.

action without leave to amend where defective futility allegations could not be cured). Thus, granting Plaintiff leave to amend would be a pointless exercise.[22]

## IV.  CONCLUSION

For the foregoing reasons, Defendants and nominal defendant's motion to dismiss is GRANTED, and Plaintiff's Complaint is DISMISSED WITH PREJUDICE.

DATED:     July 25, 2018

_____
CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE

---

[22] Not surprisingly, Plaintiff does not even make an effort to indicate what allegations he would add to his Complaint, or how he would address the fact the majority of QSI's current Board is disinterested. (Opp. at 25 n.10.)